STATE OF IOWA, Appellee, v. CLIFFORD WILSON, Appellant.

**Criminal law:** MURDER: EXPERT EVIDENCE. Under the record in this case it was not improper to permit a medical expert to state his belief, rather than his opinion, that deceased could not have walked from one room to another after he was shot the first time; it being a legitimate matter of expert testimony, and the inquiry calling for the judgment or opinion of the witness as a physician.

**Same.** Where there was evidence that difficulty in establishing a circulation through the veins and arteries when embalming a body, would indicate that a large artery of the chest was open, the evidence of an experienced undertaker that the chest of the deceased had to be filled before circulation could be established, and that such fact indicated a break in the main artery, was admissible as expert evidence.

**Same:** MURDER: PUNISHMENT: INSTRUCTIONS. In defining murder in the first degree the court should include a statement of the punishment, which is to be fixed by the jury; but this is not required in defining murder in the second degree, or manslaughter. Where, however, the court defined second degree murder in the language of the statute, which includes the punishment, but made no reference to the punishment for manslaughter, no prejudice resulted to defendant; as the jury must have understood from the instructions that manslaughter is a lower offense than murder in the second degree, and that conviction for the latter offense would result in greater punishment.

**Same:** MALICE: PRESUMPTION: INSTRUCTION. Where there was no claim that defendant was justified in killing deceased, but he relied upon the defense that the killing was done by another, an instruction that when it is shown that the killing was wilfully and purposely done in pursuance of a previous design malice is conclusively implied was not prejudicial, though erroneous in omitting to declare the right to rebut the presumption; there being no evidence which could have rebutted the presumption.

**Same:** CAUTIONARY INSTRUCTIONS. The propriety of a cautionary instruction concerning the duty of the jury rests largely in the discretion of the court, and where nothing appears to suggest its inappropriateness error can not be predicated upon the giving of such an instruction. Thus an instruction in a prosecution for

murder warning the jury against an arbitrary exercise of its power to convict of a lesser offense, or to acquit, was not inappropriate in the instant case.

**Evidence:** SUFFICIENCY OF OBJECTION. The general objection that testimony is incompetent, irrelevant and immaterial is not sufficiently specific to present the objection on appeal that the evidence was inadmissible as hearsay.

**Same:** RES GESTAE. Where it was developed on the cross-examination of a witness for the state that he had made certain statements to the coroner immediately before the killing of deceased, further statements of the witness made in continuation of the same conversation were admissible as *res gestae*.

**Same:** IMPEACHMENT EVIDENCE. Where defendant testified that he went to the home of deceased for the purpose of obtaining money to visit a lady friend, it was competent for the purpose of impeachment to show that a short time previously he had made statements to a third person indicating that the woman in question was not of good character; the evidence not being offered as an attack upon the character of one of defendant's witnesses.

**Same.** A witness can not ordinarily be contradicted as to collateral and immaterial matters brought out on cross-examination, but the court in its discretion may permit the contradiction of the statements of one accused of murder, in which he gave his reasons for visiting the home of deceased where he was killed.

**Criminal law:** MURDER: EVIDENCE: SUFFICIENCY. The evidence on this prosecution is reviewed and held to support the conviction of defendant for murder in the second degree.

**New trial:** ARGUMENT: EXCEPTIONS. Exception to the closing argument of counsel for the state, when raised for the first time in a motion for new trial, comes too late for consideration on appeal.

**Same.** It is the duty of counsel for the state and for defendant to confine their argument to matters appearing in the record, and it is the duty of the court by proper discipline to keep them within legitimate bounds; but the closing argument for the state will not be held erroneous even though outside the record, where it was invited by improper argument for defendant.

**Same.** Where a picture of the room in which deceased was killed was offered in evidence, and defendant's counsel claimed in argument that because some of the witnesses did not see defendant's hat in the room that it was not there, the fact that counsel for the state, to meet this argument, contended that the hat was about the color of the floor, and threw it upon the floor of the court

room for comparison, was not improper, even though no witness testified to the color of the floor of the house; as the picture of the room and the hat were both before the jury from which they could determine for themselves the correctness of counsel's conclusion.

**Same.** Where defendant's hat was offered in evidence, which some of the witnesses testified was in the room where deceased was killed, it was permissible for counsel for the state to argue that certain spots on the hat were blood spots.

**New trial:** PREJUDICE. The denial of a new trial for alleged improper argument will not be disturbed on appeal, unless it appears that the ruling was so prejudicial as to deprive the defendant of a fair trial.

**Appeal:** ABSTRACT OF EVIDENCE. Ordinarily the practice of setting out the whole testimony by question and answer in an abstract is improper.

*Appeal from Calhoun District Court.*—HON. M. E. HUTCHISON, Judge.

. TUESDAY, MAY 6, 1913.

THE defendant was indicted with one Roy Mertens for murder in the first degree. The indictment was in three counts—the first count was in the ordinary form, charging first degree murder; the second charged that the killing was done at a time when defendants were engaged in the perpetration or attempt to perpetrate a burglary; and the third charged that defendants broke and entered the dwelling house of James White with intent to commit a public offense, to wit, larceny and robbery. Separate trials were had. This is the second trial of the case as to this defendant. The first trial was had in Sac county, and resulted in a disagreement of the jury. A change of venue was then taken to Calhoun county, and defendant was convicted of murder of the second degree. He was sentenced to the penitentiary for life, and appeals.—*Affirmed.*

*W. H. Hart, E. C. Stevenson* and *Faville & Whitney,* for appellant.

*George Cosson,* Attorney General, *John Fletcher,* Assistant Attorney General, and *W. A. Helsell,* for appellee.

Preston, J.—About midnight of May 29, or early in the morning of May 30, 1911, James White and his son, Matthew White, were killed within a few minutes of each other in the home of the father. The pistol shots which caused their death were fired by defendant Wilson, or his codefendant, Mertens. They were jointly indicted for the killing of the senior White. Defendant admits he went to the house with Mertens, but denies that he was inside where the shooting took place.

The coroner, Dr. Townsend, who was also a physician and surgeon, arrived at the scene about 2 o'clock in the morning of May 30th, and found the old gentleman lying on his back, on the floor in the sitting room, dead. Matthew was lying on the kitchen floor, dead. The sitting room is designated on the plat used in evidence as "A" and the kitchen as "D." There were two bullet wounds in the body of James. The coroner, Dr. Townsend, described the wounds, and gave it as his opinion that both were fatal, and that one of them was instantly so. In one of the wounds as described the bullet entered the left arm about two and one-half inches below the shoulder, passed directly through the body and through the skin of the right arm on a due level through the body. There were vital organs in the line where the bullet would likely touch. In the other the bullet entered the left chest three inches to the left of the median line between the first and second ribs, and passed through and out at the upper angle of the shoulder blade.

William White, another son of deceased, who claims to have seen this defendant fire the shots, testified that said

deceased was in the sitting room when shot, that defendant pointed the pistol at deceased, and that deceased fell to the floor at the first shot, and that the second shot was fired when deceased was down. So that there was direct evidence, and some other circumstances, tending to show that deceased was shot while in the sitting room. Defendant's counsel claim there were some circumstances tending to show that deceased was in the kitchen when he was shot, and that, if this is so, William could not from his position have seen the shooting, or at least the first shot.

There were three wounds on the body of Matthew. Some of the witnesses say there were five shots altogether, and others say six. It was an important question whether James White was in the sitting room or in the kitchen when he was shot. On reexamination Dr. Townsend was asked:

1. CRIMINAL LAW: murder: expert evidence.

Q. As a matter of the knowledge of a doctor and the knowledge of the wound which you examined, do you believe it was a physical possibility for Mr. White, after he received the second shot, or the first shot, or whatever it was which went through his breast and through his two arms, to have walked from room "A" into room "D" to room "A" and fallen on his back? (The defendant objected as not proper redirect examination, incompetent, irrelevant, and immaterial, calling for the belief of this witness, and as seeking to cross-examine his own witness, and it is seeking also to invade the province of the jury, the question of the belief of this witness is wholly immaterial. Overruled, and exception.) A. It was my belief that he never could have walked from that kitchen. Q. You don't believe that he could ever have walked from that kitchen to that room and fallen where you found him after that second shot went through? (Same objection, ruling and exception.) A. That is my belief.

The argument here is that the court erred in permitting the witness to state his belief, and urges that the manner in which the question was asked permitted the witness to in effect step into the jury box and express his

belief whether deceased was shot in the kitchen, or in the sitting room. If the question was as to whether the witness could have been asked where deceased was when shot, there would have been force in the objection. The fact is the witness did testify, on recross-examination, and without objection, that it was his belief that deceased was in the kitchen when the shot was first fired, and went to the sitting room where he was shot the second time. This was favorable to defendant; that being his claim. Witness also testified without objection to his belief that the shot where the bullet went through the body between the second and third ribs was the first shot. He also said it was a mere matter of guesswork, and that he · did not know where deceased was when shot. His belief that deceased was first shot when in the kitchen seems to be based on the assumption that a bullet found in the wall in the kitchen passed through the body of deceased. The question here complained of did not ask for the belief or opinion of the witness as to where deceased was when shot, but whether with such a wound, deceased could, in the opinion of the witness, have gone from the kitchen to the sitting room as an aid to the jury in determining the fact as to where deceased was. This question did not ask for the ultimate fact. The witness qualified as an expert; and, while the word "belief" is used, we think it is clear that he was giving his opinion, and the question asked for his judgment or opinion as a physician. In *State v. Harris,* 97 Iowa, 407, the word "belief" in an instruction was criticised. The instruction defining reasonable doubt stated, in effect, that, if the evidence created in the minds of the jurors a belief in defendant's guilt, they would not have a reasonable doubt that he was guilty. The court said this was not necessarily true. That a person may entertain a belief in regard to a matter which is not sufficiently firm to exclude all reasonable doubt. The statement in the instruction was qualified by other language, so that, while

the instruction was criticised, the case was not reversed. While the use of the word "belief" in an instruction, such as that, is subject to criticism, it has no application here. In some cases a witness may testify as to his belief. Lawson, Expert on Opinion Evidence, 598; Jones on Evidence (Pocket Ed.) section 170; *Chew v. O'Hara,* 110 Iowa, 81. But these cases do not apply here, for the reason, as we have already said, the question called for the opinion of an expert, and his answer was his opinion. But it is said by appellant that, if the doctor was an expert, the question and answer allowed the witness to invade the province of the jury, and cites *Sever v. Railway,* 156 Iowa, 664. The rule is there stated and the cases collated. In that case the question propounded to the witness required him to enter the domain of the jury, and pass upon one of the ultimate facts. We think this is not so in this case. The witness had testified that in his opinion when deceased received the bullet that went through the body and arms he dropped; that it was instantly fatal, and the question now under consideration simply called for his opinion whether with such a wound he could walk from one room to another. This was perfectly proper, and there was no error at this point. Under the circumstances here shown, "the nice philological distinction between the words 'opinion' and 'belief' are too subtle and refined to form a basis on which to ground substantial justice." *Day v. Southwell,* 3 Wis. 657, 661.

II. Dr. Townsend testified, without objection, that when they embalm a body they establish a circulation through the veinous system; and, if any difficulty arises in establishing it until the chest is filled with the fluid, it would show that there was a large artery open in the chest. Witness Temple testified that he had been an undertaker for ten years, and had had considerable experience; that he embalmed the body of James White by taking up an artery in the arm, and

2. SAME.

forcing embalming liquid through the arterial system; that when he started to inject the fluid the chest cavity filled up and stopped the circulation. Thereupon, this question was asked him: "Q. As borne out by your experience, what did that show you? (Defendant objected as calling for the opinion and conclusion of the witness, and that no proper foundation had been laid. The objection was overruled, and the witness answered.) A. There must have been a main artery cut, or an incision in a main artery. Before I could get any circulation, I had to fill the chest of James White full." It is said that no sufficient foundation was laid; that the witness was no more competent to tell what the action of the embalming fluid would be than any other person would have been. It is true that there had been no post mortem on the body, so that it could be told certainly whether an artery had been cut by the bullet. The doctor had testified to substantially the same thing. The witness Temple was an undertaker of ten years' experience. It had been shown by the evidence that the bullet, or one of them, had passed directly through the body of deceased, and that vital organs would be in the path of the bullet. The evidence did tend to show, or at least was a circumstance bearing on the question as to, whether deceased was shot and had fallen in the sitting room; we think the foundation was sufficient, and that the evidence was properly admitted.

III. In defining first degree murder the court quoted the statute, including the punishment. This was proper, and in fact necessary as to first degree, as the punishment is to be fixed by the jury. In defining

3. SAME: murder: punishment: instructions.

second degree murder, the court said: "Defining murder in the second degree the statute is: 'Whoever commits murder otherwise than as set forth in the preceding section, is guilty of murder in the second degree, and shall be punished by imprisonment in the penitentiary for life, or for a term not less than ten

years.' " But the court did not state the punishment for manslaughter. Defendant complains of this, and says that the court should not have mentioned the punishment for second degree murder. No cases are cited by either defendant or the state on this proposition. Our experience is that such an objection is usually made by the state, as in *State v. McGhuey,* 153 Iowa, 308. The purpose of the defense in referring to the severity of the punishment in argument to the jury is apparent. It was not necessary for the court to refer to the punishment for second degree murder, as the jury had nothing to do with that. It would have been as well to have omitted it. But, if there was any error, it was favorable to the defendant. The jurors must have understood from the instructions that manslaughter was a lower degree of the offense charged than murder of the second degree. They knew that, if their verdict was for murder of the second degree, the punishment would be at least ten years, and might be for life. The tendency would be perhaps for the jury to have some sympathy for defendant (a young man, who, as his counsel claimed, had fallen in with Mertens, a hardened criminal), and reduce the verdict to the lower degree.

When the offense is statutory, the definition of the crime may be given in the exact words of the statute. 12 Cyc. 614. This is what the court did here. Merely reading to the jury the statute which fixes the punishment is not error. 12 Cyc. 641, 642; *People v. Henderson,* 28 Cal. 465; *Commonwealth v. Harris,* 168 Pa. 619 (32 Atl. 92); *Miller v. Commonwealth* (Va.), 21 S. E. 499.

There was no error in not stating the punishment for manslaughter. The court is not required to do so. *Currier v. State,* 157 Ind. 114 (60 N. E. 1023).

IV. Instruction No. 14 is complained of. In it, after defining malice as applied to the circumstances of this case, the court said:

. . . This malice may be either express or implied. When the killing is done with a sedate, deliberate mind, and in pursuance of a design previously formed, the malice is express. Under such circumstances, the presumption of malice is conclusive. . . . When the killing is shown to have been wilfully and purposely done, unless the evidence which establishes the killing also shows some circumstances or infirmities which excused the act or mitigated the degree of guilt, the law implies malice. That is, that upon such a state of facts a legal presumption arises that the act was done with that degree of malice which makes the crime murder, but such presumption is not conclusive; it may be rebutted by proof that the party acted under such circumstances of necessity or infirmity as excused the killing or mitigated the degree of the crime.

In instruction 18 the jury were correctly instructed as to the presumption of malice from the use of a deadly weapon in a deadly manner, without legal excuse. It is urged by counsel that, under the first part of the instruction just quoted, the presumption of malice that arises from the killing and the doing of the act "with sedate and deliberate mind and in pursuance of a design previously formed to kill" is always a rebuttable presumption; that a man may kill another and do the act with a sedate and deliberate mind, and in pursuance of a previously formed design to kill, and still do it all in self-defense. The instruction must be considered in the light of the evidence. Defendant did not claim that he acted in self-defense. His only defense was that he did not do the shooting, and that he was not concerned therein. We are unable to see how a person with hatred, ill will, or hostility towards another, or with a feeling of revenge or enmity against him, there being no evidence or claim or excuse or justification, can rebut the presumption of malice, where the killing is done with a sedate, deliberate mind, and in pursuance of a design previously formed. Under this instruction, the jury were required to first find that the killing was so done before it

4. SAME: malice: presumption: instruction.

could be said that the presumption of malice is conclusive. In *State v. Townsend,* 66 Iowa, 746, the court instructed that malice is proved by the selection and use of a deadly weapon. This court held that to be error because that fact alone did not prove or establish malice, but merely raised a presumption of malice, which may be rebutted. The instruction in the case at bar does not say that the use of a deadly weapon makes such a presumption conclusive, but the deliberate killing, in pursuance of a previously formed design, with a feeling of hostility, revenge, and the like, does have that effect; that is, such facts do show and are express malice. The latter part of the instruction refers to implied malice.

In *State v. Hayden,* 131 Iowa, 1, where insanity and self-defense were claimed, the court said: "The rule almost everywhere is that from the mere fact of killing the inference of malice arises; the burden being on the prosecution to raise it to murder in the first degree, and on the defense to reduce it to manslaughter. Of course, we do not mean to say that a jury should ever be instructed that the burden is upon a defendant to show want of malice. We use the above expression for want of a better term in which to convey the thought. What we mean is that an unexplained killing with a deadly weapon is evidence of malice, and that the burden is on the accused in that sense that he must make proof of legal excuse, justification, or extenuation, or take the risk of a conviction upon the presumption or inference of malice." See, also, *State v. Curtis,* 70 Mo. 594. In *State v. Becker,* 9 Houst. (Del.) 411 (33 Atl. 178), it is held that, where the person who slays another does it deliberately—that is, with a design to kill him, and without the existence of any circumstances which in law are a justification or excuse—he is guilty of murder of the first degree; he is said to have acted with express malice. See note to 38 L. R. A. (N. S.) 1084-1087; 21 Cyc. 707. In this case, had there been anything in the evidence or in the

circumstances of the killing showing justification or excuse, the court should have qualified the instruction. The instruction is not approved, but we think under the evidence no prejudice resulted. It is our duty under the statute to decide the case without regard to technical errors which do not affect the substantial rights of the parties. It is not error to fail to instruct that a presumption may be rebutted, where there is no evidence in the case tending to rebut the presumption. *State v. Wilson,* 152 Iowa, 529. The court fully and carefully explained all the degrees of homicide as applied to the different charges in the indictment. Under the indictment and the evidence, the instruction here complained of, taken as a whole, and in connection with other instructions given, is not erroneous. It should be borne in mind on this point that the conviction was for only second degree murder.

V. Complaint is made of instruction No. 21. It is, in part, as follows: "You have been told herein that the defendant may be convicted of murder in the first degree, or murder in the second degree, or manslaughter, or he may be found not guilty. This does not mean that you are at liberty to convict or acquit at pleasure. . . . The fact that you have power to return a verdict finding a lesser crime or acquittal is alone no excuse for using such power. The lower conviction or an acquittal should not rest on the notion that you can do as you please arbitrarily." The instruction then proceeds to tell the jury that, if they have a reasonable doubt of the degree, to acquit of the higher, or, if they have a reasonable doubt of his guilt, to acquit. Instruction No. 16 also correctly directed the jury as to their duty if they had a reasonable doubt as to the degree of guilt, if guilty, and that they should acquit if they had a reasonable doubt as to his guilt, and in instruction No. 41 they were told to retire and consider the case fairly and honestly in the light of the evidence and the instructions.

5. SAME: cautionary instructions.

Counsel insist that the jurors "are at liberty to acquit at pleasure; that is, exactly what they have a legal right to do." To such a doctrine we can not assent. Jurors can act arbitrarily, and they have the power to do as they please, but they have no right, either legal or moral, to do so. It is true they do have the right to say which of the witnesses they will believe, and which they will not believe, and have a right to disbelieve all of them.

We are cited to *State v. Lightfoot,* 107 Iowa, 352, and *State v. Carter,* 112 Iowa, 15. These cases simply hold that the court can not assume a fact to be true in a criminal case, even though uncontradicted; that it is for the jury to weigh the evidence, and not for the court. In the first of these cases the court was discussing the question of trial by jury under the Constitution. In the argument in that case it was said, and of course it is true, that the jury could disregard the evidence and their own consciences, but that is not saying they ought to do so, or that it would be right. It is proper to caution the jury to not act arbitrarily, but to decide the case on the evidence, under the instructions, disregarding all else. *State v. Butts,* 107 Iowa, 653; *State v. Engstrom,* 145 Iowa, 205; *State v. Hunter,* 118 Iowa, 695. So far as we know, counsel for the defense may have argued to the jury as they have here that the jurors had the right, as well as the power, to acquit the defendant, even though they may have been satisfied beyond a reasonable doubt of his guilt. If so, the court had authority to caution the jurors as to such argument, and it was its duty to do so. Matters occur in the trial which do not appear in the record in this court. Whether or not a cautionary instruction is required rests largely in the judgment and discretion of the trial court. *Hoskovec v. Street Ry.,* 85 Neb. 295 (123 N. W. 305). Whether the jurors could be called to account if they did act arbitrarily we need not now determine. But in *State v. Miller,* 53 Iowa, 84, 154, 209, this court approved an

instruction in which the jurors were told that it was their
duty to follow the law as given by the court, and that,
unless they did so, they were guilty of perjury.    There
was no error in this instruction.

VI.    Soon after the coroner arrived at the scene of
the killing, he placed the son, William White, under arrest.
Within a few minutes, or at least within a short time after
this, William had a conversation with one
Lee in the house.    He was then under arrest,
and says he thought they were accusing him
of shooting his father.    His appearance at this time as
witnesses describe it was that of having been badly pounded
up, his eyes and lips were swollen and bloody, and it is
claimed this was done by the defendants before the killing.
He says he was frightened and made statements which were
not true.    On cross-examination by defendant's counsel he
was asked about these statements, and as to whether he did
not tell Lee he was in bed, undressed, and as to whether
he was asked by Lee who shot his father, and other similar
questions.    On reexamination he testified that, after telling
Lee these things, he told Lee and Dr. Townsend to come
outdoors, and he would tell them the whole story.    They
went out immediately, and at this point the record shows
the following:

6. EVIDENCE:
   sufficiency
   of objection.

Witness William White, on reexamination testified
that:

After telling Mr. Lee this language, I said something
else to him, and asked Mr. Lee and Dr. Townsend to come
outdoors, and I would tell them the whole story.    Q. What
is the fact as to whether you told them anything then as
to just what happened that night?    (Objected to as calling
for the conclusion of the witness, immaterial, irrelevant,
and not proper redirect examination.    Overruled.)    A. I
did.    Q. What is the fact as to whether you told them
then the same way you have told the jury as to the death
of your father?    (Same objection, and for the reason he
has told the story two or three different ways, and the jury

can not tell which one he means; calling for a conclusion and opinion, and not a statement of the conversation.) Court: He may narrate the conversation. Counsel for State: Well, I will prove it by the other people.

Dr. Townsend was then called, and testified:

I heard the story told by William White immediately after he made certain statements to Mr. Lee. It was told to Mr. Lee, myself, and Mr. Shannon. Mr. Lee says to him, 'How is this, your shoes on and all laced up, and your coat on, your collar on, and your father and brother shot here, and you say you were in bed?' White says, 'You come out here and I will tell you the exact truth.' So we went outdoors, and he told us about being with Wilson and Mertens. Q. Did he tell you who shot his father then? A. He did. (Objected to as immaterial, not proper cross-examination.) Well, what is the objection? Defendant: Immaterial, hearsay, incompetent, and irrelevant. Court: I think it is as to what he told him. Counsel for State: We claim that is a part of the *res gestae*. It occurred right there, and it is a part of the conversation about which they have inquired; the witness admits that he told a story that was untrue, and right then and there, as soon as he got his second breath, he turned around to these men and says, 'If you will come out, I will tell you the exact truth of what happened.' Court: It may be part of the *res gestae*. Counsel for State: That is what I am claiming for it, and that it is a part of the same transaction. Court: Go ahead. A. He said Clifford Wilson shot his father. I have heard his testimony given here in regard to the shooting. Q. What do you say as to whether or not he told you the same story, in substance, then and there, when he told you to come out there, that he now tells upon the stand? (Objection sustained.) Q. In this conversation with Mr. Lee and you and the other man, did William White ever say that anybody else than Clifford Wilson shot his father? (Same objection. Overruled.) A. No, sir. He never said who shot Matthew White, and never made any claim that he knew who shot Matthew.

It is now objected by defendant that this was hearsay.

But, under the foregoing record, that objection seems not to have been made in the district court to the statement that White said "Clifford Wilson shot his father." That is the part of this testimony now most seriously objected to, because, as counsel argue, it bolsters up White's evidence wherein he had testified that he saw Clifford Wilson shoot deceased. It will be noticed that the first time the objection was made that it was hearsay was after the answer to the question, "Did he tell you who shot his father?" and there was no motion to exclude the answer. That objection was either to the preceding question, or to the answer to it, so that the only question properly objected to as hearsay was the last one above quoted.

True, some of this evidence, if not all, was objected to as incompetent, etc., but, as we have said, the argument here is based on the thought that it is hearsay. The general objection that it is incompetent, irrelevant, and immaterial is not sufficiently specific to raise the objection now that the evidence was hearsay. *White v. Smith,* 54 Iowa, 233; *Buettner v. Steinbrecher,* 91 Iowa, 588; *State v. Beebe,* 115 Iowa, 128; *Matthews v. Luers,* 110 Iowa, 231; *Longan v. Weltmer,* 180 Mo. 322 (79 S. W. 655, 64 L. R. A. 969, at page 976, 103 Am. St. Rep. 573), 8 Am. & Eng. Enc. Pl. & Pr. 223-227.

But, conceding for the purpose of argument that the evidence was properly objected to, especially as to the last question, it is clear to us it was a part of the same conversation about which defendant's counsel had cross-examined the witness. And, further, it was immediately after the conversation in the house and a part of the *res gestae* of that transaction in regard to the conversation, and explanatory of the evidence brought out on cross-examination in regard to that matter. Without further discussion, the following cases indicate the tendency of recent decisions on the doctrine of *res gestae: Ins. Co. v. Mosley,* 75 U. S. (8 Wall.) 397 (19 L. Ed. 437);

7. SAME: res gestae.

*Puls v. Grand Lodge,* 13 N. D. 559 (102 N. W. 165);
*State v. Blydenburg,* 135 Iowa, 264. In the cases cited by
appellant the matters claimed as *res gestae* related to a
past transaction after it was over.

VII. In the state's rebuttal, one Goodson testified
as follows:

After supper at Coney Island, on May 29th, Clifford
Wilson and Mertens went to one side and talked by them-
selves, and afterwards they called me over. Wilson said
that he knew a girl at Nemaha. Q. Did Clifford say to
you that he knew a girl in Nemaha, and that she was a
sporty woman? (Objected to as immaterial whether he
did or not; if offered for the purpose of impeachment, it
is impeachment of immaterial matters, it has no connection
with this tragedy. Overruled.) A. Yes, sir; he said she
was a sporty woman. He said that he and Mertens were
going to telephone to her and were going to go up and get
her and bring her down to Sac City, and, if I and a man
called the barber would chip in and help pay the expense,
that he would give me a bottle of whisky.

It is said that in admitting that part of the evidence
objected to the court erred, for that it tended to discredit
a girl who was a witness for defendant, and who lived at
Nemaha. The only objection as to this was
that it was immaterial. The name of the
girl was not mentioned in the evidence of
Goodson. But defendant's counsel say it referred to the
young woman to whom defendant claimed he was to be
married. Defendant also claims that such evidence related
to collateral and immaterial matters brought out on cross-
examination, and not properly the subject of rebuttal.
Defendant testified on cross-examination, without objection,
in regard to this matter, and denied having made the
statement. He admits that he may have said something
about a sporting woman that afternoon. Defendant ac-
counts for his presence at the home of James White,
deceased, by a story which the state claimed was highly

improbable. Without going into all the details, his claim, stated as briefly as may be, is: That he was engaged to be married to this young woman, who was a farmer's daughter, nineteen years old, and lived three miles from Nemaha. That prior to May 29th it had been understood that they would be married June 15th. Mertens was a stranger to defendant and to William White. They met during the day of May 29th at what is called Coney Island, or the Jungles, a place on the river near Sac City where tramps and drinking parties meet. That day some one had stolen a quantity of liquor, hid it, and defendant says he went and got it, and hid it in the weeds. He says he had two bottles with him and hid twenty-one. It was whisky, as we understand it. Defendant says he drank with Mertens and got "chummy" with him, and told him of his girl at Nemaha. That he told Mertens he was going to see her, and that Mertens said he was going along. In the evening he telephoned her to meet him at the train at 10 o'clock that night. Mertens may have paid for the telephone message. That he and Mertens did take the train about 9 o'clock that evening and went to Nemaha, but the girl was not at the depot, so they came back to Sac City on a freight train. He says he did not ask Mertens to go; that he (defendant) had lots of whisky, and Mertens went for a little trip. About 11 o'clock that night defendant and Mertens were with William White at a restaurant, and soon after that the matter of defendant's marriage was discussed, and White suggested they get an auto, and go and' see the girl that night. Defendant had no money to get a car, so White gave him his pocketbook, and told him to get a car. Defendant started to the city hall to telephone for a car, but met the night watch, and, while waiting for him to get out of sight, they spoke of a time they had had at Sioux City. Defendant spoke of his approaching marriage on June 15th, and White suggested that they go at once, hire a car, get the girl and go from Nemaha

to Storm Lake, catch the train, go to Sioux City and have a time. Defendant was willing to do this, and White was to furnish the money. As they walked along, White wanted to put it off until some other night, but defendant insisted that, as they had gone that far, he wanted to go on. The argument got pretty hot, he says, and White wanted his money back and grabbed defendant, when defendant hit him and knocked him down. Finally they made up, and decided to go on the trip. At this point Mertens appeared, according to defendant's evidence, and White started to run and Mertens went after him. Defendant did not go home then because White wanted him to go with him to get the $100, and defendant was willing to go. The three, William White, defendant Wilson, and Mertens, then went to the home of deceased, where William White was staying. The shooting took place very soon after. White denies all this evidence as to the part defendant claims he was to take in the marriage, and as to his furnishing the money. White's claim is that defendant and Mertens robbed him of his pocketbook, and asked whether White's father and brother had any money at home, then forced him to go with them to the home of deceased; that on the way Mertens gave him two beatings; and that this defendant pointed the pistol (with which the shooting was afterwards done) at him and threatened to kill him, if he told any one.

Without commenting on this story of defendant, we think the evidence of Goodson was competent and proper rebuttal as bearing on the probability or improbability of defendant's story, not to discredit the girl. In fact, her character was not attacked either in the evidence or the argument to the jury. It was a proper circumstance for the jury to consider whether defendant's story was true, if he himself considered her a sporty woman. A witness may be cross-examined concerning his inconsistent conduct, and his inconsistent action and conduct may be shown as

well as statements.    Jones on Evidence (Pocket Ed.) sec. 845.

Furthermore, the testimony in dispute was that of the party himself.    He had told in detail his doings and sayings that afternoon and evening, including transactions and conversations with this same witness Goodson, who had been on the stand as a witness for defendant.    It is doubtless true that ordinarily a witness may not be contradicted on collateral and immaterial matters brought out on cross-examination.    We think the evidence was properly admitted, and, even if it was collateral, it was a matter of discretion for the trial court. Jones on Evidence (Pocket Ed.), sec. 172.

*9. SAME.*

VIII.    It is claimed that the verdict is not supported by sufficient evidence.    That it is the result of passion and prejudice, and that the judgment is excessive.    The evidence for the defense as to the shooting was almost entirely that of the defendant.    Impeaching evidence was introduced, tending to show that his moral character was bad, and no evidence was offered to sustain it.    It would serve no useful purpose to set out the evidence fully, and the opinion ought not to be extended to do so.    Some of the evidence has already been referred to.    William White was an important witness for the state.    He had been drinking and had been roughly handled, and it is conceded made some false statements, but his evidence is corroborated circumstantially at some of the important points.    We think the jury were fully justified in believing that the old gentleman was shot while he was in the sitting room.    William White so testified, and that deceased fell at the first shot.    The deceased was found there soon after with two mortal wounds, one of which, according to the evidence, would produce instant death.    There was a large pool of blood under his body, but there was no trace of blood from the kitchen to the

*10. CRIMINAL LAW: murder: evidence: sufficiency.*

sitting room, and none on his face or hands. There was no evidence of any struggle.

The evidence for the state tends to show the following facts in addition to those already stated: When defendant, with Mertens and William White, reached the walk leading from the street to the house of deceased, defendant told White he could go in. White did go in the house at the west kitchen door, then went north into the sitting room, and to his father's room through an opening at the northeast corner of the sitting room. The father's bedroom, and another bedroom south of it, in which Matthew slept, were east of the sitting room. There is an opening in the south side of Matthew's room into the kitchen, and a porch west of the kitchen. There were lights burning low in the kitchen and sitting room. When William went in, he woke his father, and told him there were two men going to rob him. The old gentleman jumped quickly out of bed, and went into the sitting room. William was then standing in the doorway or opening from his father's room into the sitting room, with his head about a foot out in the sitting room. He says he then saw defendant Wilson and Mertens just inside the sitting room near the door between the kitchen and sitting room, and that they had handkerchiefs over the lower part of their faces. The old gentleman ordered them out, and almost instantly he was shot twice; the shots being close together. That defendant Wilson pointed the pistol at deceased when he fired, and that deceased fell to the floor at the first shot; that the second shot was fired when deceased was down. Shortly after three other shots were fired in quick succession, then it was quiet. William and his mother found James White on the floor in the sitting room, and Matthew lying dead with three bullet wounds. His body was lying near the west kitchen door. It is the claim of the state that at the first shooting Matthew came into the kitchen from his room through the door near the northeast corner of the kitchen.

A person who had been sleeping in a tent near these premises testified that after the shooting he heard two people pass, walking, and one said to the other: "I got 'em, I know I got 'em, come on." Defendant admits this conversation, except that he says the language was, "I got 'em both," but he claims Mertens said it to him. Defendant testifies he thought Mertens meant he had shot someone. He ran home and told his mother about it. She says he came home about 12 o'clock, that he had been running and was out of breath, and that he had been drinking. Defendant admits he had been drinking, but testifies he was at himself, and knew what he was doing. The mother further testifies that defendant said, "One of the guys that was with me tonight shot a man." Defendant had passed the night watch a few minutes before, and must have known where the officer was, but did not inform the officers of the shooting. Defendant was arrested the next day, and a witness testifies that his father told him to tell these men all about this, to which defendant replied, "Yes; I will tell them a damned sight." The use of this language is denied by defendant and his father, though they admit a conversation on that subject. Defendant testifies that, when they got to the house of deceased, he did not go in, but he heard Mertens and William White go in; that he heard William say that Wilson and this fellow were trying to rob him, and it made him mad. He says further: "As I started in somebody hollered, 'Get out of here, you blackguards,' and I turned and ran. At that time I was on the porch, right in front of the door that goes in from the porch. I was not inside the room. I could not have been more than a step, I just started in. I was not in the kitchen, but was just starting into the door when I started to run. There was no light in the kitchen when I started to go in. When I put my foot in the door, I heard some one say, 'Get out of here, you blackguards,' and I started to run, and did not stop until I saw mother. We had been

planning until we got to the house, and I thought Bill was going in to get the money." He admits that the brown hat introduced in evidence was his, and says: "I had it on that night and lost it when I turned and ran from the porch, but don't know where. I did not lose it inside the house." A witness testifies to finding this hat the next morning on the floor in the kitchen. From the evidence we judge it was found about where the dead body of Matthew was found. Other witnesses who were there testified that they did not see the hat in the kitchen. If there were but five shots fired, they are all accounted for.

It is argued by the defense that the bullet found in the wall over the door in the north side of the kitchen and near the northeast corner is the bullet which went through the body of James White; that, therefore, James White was in the kitchen when he was shot, and that William White from his position could not have seen the shooting. The bullet in the wall was over the door from which Matthew must have come from his room into the kitchen. The argument is that, considering the place where this bullet was found in the wall, and its distance from the floor, the height of the deceased, and the position a person firing the shot would be likely to be in, and the angle a bullet would take under such circumstances, that this bullet must have gone through the old gentleman. This was a circumstance proper for the jury to consider. The evidence was such, however, that it was a question for the jury. We have already said that the jury may have well believed that deceased was in the sitting room when shot. If there were six shots, as some of the evidence tends to show, one of them could have been aimed at Matthew as he came out of the door of his room and gone wild. The evidence tends to show that a person standing where William says he did could look southwest, through the door between the kitchen and sitting room, and see across a part of the northwest corner of the kitchen as far as the west kitchen door. It

would be difficult for any person under the circumstances to locate the exact position of every person concerned in the shooting. We have given more of the evidence than we intended, but have not set out the details of all of it. Enough has been given to show that it was clearly a question for the jury. The jury found defendant guilty; the evidence was such that a verdict of either first or second degree murder would be sustained. It was an aggravated killing, and the judgment is not excessive. The verdict being for murder of the second degree, the jury evidently were not carried away by anything occurring on the trial.

IX. W. A. Helsell assisted in the trial as special prosecutor. Appellant contends that said Helsell was guilty of such misconduct in his closing argument to the jury as to require a reversal. A great many matters are complained of. It is another case coming to us where the closing argument only was taken down by the reporter, and counter affidavits were filed by the state as to what counsel for the defense said in their arguments to the jury. The closing argument is set out in full in sixty-six pages of the typewritten abstract of record. Ninety-six of the one hundred and fifty-seven pages of appellant's printed arguments are taken up in the discussion of this proposition, and seventy-nine cases are cited. Manifestly we can not review all these at length in an opinion which is already beyond reasonable limits. It is doubtful whether many of the matters in the closing argument of which complaint is now made were properly excepted to and in time.

*11. New trial: argument: exceptions.*

Some of them, including the reference to the hat, were excepted to in the motion for new trial which was too late. *State v. Sale,* 119 Iowa, 1.

It should be said, however, that there were at first some interruptions of Mr. Helsell by counsel for defendant, and defendant did object to some of the statements, when

Mr. Helsell asked counsel to not interrupt him, and said
that they could have an exception to all the
argument.

12. SAME.

The state, in resistance to the motion for new trial,
filed the affidavits of Mr. Helsell and six others, which
were not denied by the defense. In these affidavits it is
claimed that all the matters complained of were in answer
to arguments of attorneys for defendant. The argument
itself purports to be so, and we are reasonably satisfied
that this is true. We have no means of knowing certainly.
This being so, we ought not to interfere. *State v. Hutchison,* 95 Iowa, 566; *State v. Sale,* 119 Iowa, 1.

The situation as we view it, and the record bears us
out, is simply this: The defense was represented by shrewd,
able counsel of high standing and large experience. The
county attorney alone may have been at a disadvantage
against such an array of opposing counsel. It is a well-
known fact that our prosecutors are as a rule young and
inexperienced, but men of character, and who have the
confidence of the people who elect them. It sometimes
happens that they are not able to cope with the more expe-
rienced counsel usually retained in the more important
cases, and the result is that occasionally a case is not as
fully presented to the jury as it might have been, and there
is a miscarriage of justice. We do not intend any reflec-
tion or criticism upon our prosecuting attorneys, the jury
system, or our juries. Jurors are usually inexperienced
in such work, and in certain classes of cases they may be
more or less prejudiced, yet as a rule they do right. While
there may be an occasional miscarriage of justice, this is
the exception and not the rule, and there are at the same
time hundreds of cases, civil and criminal, where justice
is done. These are looked upon as being a matter of course,
and are not mentioned, while the exceptions are freely and
widely commented upon, and then well-meaning people,
who do not understand the situation, condemn our juries,

the courts, and the laws as a whole. In this case Mr. Helsell was appointed or employed as a special prosecutor. This has been repeatedly held to be perfectly proper, and the statute provides for it, and yet it was argued to the jury that he had no business in the case; that he was in the case for pay, trying to coin drops of blood into gold; that he was trying to convict a man he knew to be innocent; that he was guilty of manufacturing evidence. And, if he made an objection to the evidence, it was argued he was trying to suppress evidence, and so on. The oral argument in this court was along the same line. The special prosecutor was really placed on trial. It all sounds very familiar. Of course, the prosecutor, special or general, ought to be fair and ought to stay within the record, and the defense ought to do the same. The better way would be to try all cases on the merits. If counsel on either side do not keep within the record, they should be disciplined by the court, if necessary; but, if attorneys for one side expect the other to stay within the record, they should do so themselves. *State v. Cleary,* 97 Iowa, 413. The rules are well settled in this state as to what matters counsel may talk about in argument to the jury. There are many cases, among them *State v. Burns,* 119 Iowa, 663; *State v. Drake,* 128 Iowa, 539. If counsel are exceeding the proper limits of argument, it is the duty of the trial court to stop them on his own motion, or sustain an objection thereto, if objection is made at the proper time. From the fact that the court did not do so in this case justifies us in assuming that he considered the argument of Mr. Helsell as within proper bounds. The trial court heard all the arguments, and was in a much better position than we can be to determine the matter.

We shall notice some of the objections now made to the remarks of the special prosecutor in regard to the defendant's hat, which was introduced in evidence and which is before us. This is the matter about which the

defense most complains.    There was a dispute in the
evidence as to whether the hat was in
13. SAME.        the kitchen.    A witness for the state
testified to finding it on the floor in the kitchen
the morning of and after the tragedy.    Other witnesses
who were there did not see it.    Mr. Helsell argued
that it was about the same color as the floor, and that for
that reason the witnesses may have overlooked it.    He then
threw the hat on the floor of the courtroom for comparison.
No witness testified to the color of the floor of the kitchen.
We think the color of our ordinary wood floors is a matter
of such common knowledge that proof is not required; but
a photograph of the kitchen was in evidence, which shows
the floor to have been covered with figured oilcloth or
linoleum.    The jury had the photograph and the hat before
them and in their jury room, and could compare and deter-
mine for themselves whether the inference or conclusion
of the prosecutor was correct.    If counsel had thrown a
black hat on a white snow bank, and argued that they were
of the same color, the jury would have been apt to detect
the difference.

Again, it is urged that the prosecutor was guilty of
misconduct in claiming for the first time in the closing
argument that there were blood spots on the hat.    There
are, in fact, one or two small spots on the hat
14. SAME.        which may be blood.    There was no evidence
introduced that they were.    The hat was in evidence, with-
out objection, and for all purposes.    There may be cases
where stains claimed to be blood should be shown by evi-
dence to be such, but we can conceive of many others where
proof would not be required.    In this case the defense had
argued strenuously that the hat was not in the kitchen, and
challenged the state to tell the jury in the closing argument
how it could possibly be so.    According to the testimony
of the witness who claims to have found the hat on the
kitchen floor, it was found at about the place where the

dead body of Matthew White, with three bullet holes in it, laid. It may have been under the body. Under such circumstances, the conclusion of the prosecutor that the stains on the hat were blood was not unwarranted. It was not an unreasonable inference that the stains were blood, and that they were on the hat because it was in the house. The jury had the hat for inspection, and had the right to examine it and the spots. The prosecutor has a right, within reasonable limits, to draw his own deductions as to facts from other admitted or proven facts. *State v. Tippet*, 94 Iowa, 646; *State v. Thomas*, 135 Iowa, 717. It was said in the *Tippet* case: "We would not relax the rule requiring counsel to confine their arguments to the record; but, as we have said, inferences of facts, from facts and circumstances actually shown, are permissible, and unless such right is abused, or it is shown that the prosecutor has acted in bad faith, or has intentionally violated the rules applicable to arguments to the jury, and that such facts have prejudiced the defendant, we should not interfere."

In *State v. Thomas, supra*, it was said that mere misconduct of counsel is not enough alone to require the granting of a new trial, unless it appears to have been so 15. NEW TRIAL: prejudicial as to deprive the complaining prejudice. party of a fair hearing of his case by the jury on the evidence. The trial judge saw and heard all that took place on the trial. It was his judgment that there was no prejudice. We ought not to interfere with his discretion in refusing a new trial.. *State v. Waterbury*, 133 Iowa, 135; *State v. Norman*, 135 Iowa, 483. We have examined the entire record with care, and conclude that there is no sufficient justification in the record for interfering with the judgment.

X.    Appellee filed an additional abstract, which appellant has moved to strike. The additional abstract properly corrects some matters, and a part of the testimony of the

defendant is set by question and answer. Ordinarily this is not to be commended, but under the circumstances of this case, we think it was justified, and the motion is therefore overruled.

16. APPEAL: abstract of evidence.

—*Affirmed.*