## The People v. Thomas Lilly.

*Homicide in self-defense.*

A conviction of manslaughter disposes of all exceptions that relate only to a charge of murder.

It is the right and duty of one who is assailed and put in personal peril to protect himself without leaving it to others to protect him to their own risk.

A man was attacked after dark upon his own premises, where his wife and family were, by a powerful and violent man who was in liquor, and in self-defense killed him. *Held* that if he believed with reason that it was necessary to kill his assailant for the protection of his own life, or to save himself from great bodily harm, it was an excusable homicide, and that he was under no obligation to flee, nor to call for the interference of bystanders.

One who has killed an assailant in self-defense and is tried for the homicide, may show by others that the conduct of the deceased at the time of the killing had been so violent as to alarm them; and he can also show the behavior of the deceased on the way to the commission of the homicide.

Exceptions to Cass. Submitted January 15. Decided January 29.

Attorney General *Otto Kirchner* for The People.

*Spafford Tryon* and *D. Darwin Hughes* for respondent. In a case of homicide alleged to be in self-defense, a

witness may give his opinion as to whether the tone or manner of the assailant was such as to inspire fear (*Stewart v. State*, 19 Ohio, 307; *Lewis v. State*, 49 Ala., 1; *People v. Morrigan*, 29 Mich., 8; *Delafield v. Parish*, 25 N. Y., 105; *State v. Pike*, 49 N. H., 414; *Hewlett v. Wood*, 55 N. Y., 635), and may describe his manner by illustration (*Com. v. Piper*, 120. Mass., 185); it may be shown that he was apparently much stronger than the person he attacked (*Wellar v. People*, 30 Mich., 22; 1 Whart. Crim. Law, 436; Tiffany's Crim. Law, 475), and if such testimony is received without objection, the judge cannot strike it out, *Hall v. Earnest*, 36 Barb., 591; *Lindsay v. People*, 5 Hun, 104; any thing said or done by him or by his companions in his presence, in the course of the acts leading to and connected with the homicide are admissible, *State v. Keene*, 50 Mo., 357; *Patten v. People*, 18 Mich., 327; *Stokes v. People*, 53 N. Y., 175; *Hurd v. People*, 25 Mich., 413; the prosecution should give evidence of any quarrel directly leading to the affray, *Durant v. People*, 13 Mich., 353; *Maher v. People*, 10 Mich., 225; *State v. Bryant*, 55 Mo., 75; *State v. Sloan*, 47 Mo., 604; whether a pocket knife used by respondent in the affray was a deadly weapon is a question for the jury, *Com. v. Drew*, 4 Mass., 395; *U. S. v. Small*, 2 Curt. C. C., 241; *State v. Dineen*, 10 Minn., 407; every reasonable doubt must be for the respondent's benefit, *People v. Schryver*, 42 N. Y., 1; *Meyers v. Com.*, 83 Penn. St., 131; one who is attacked may do whatever is reasonably necessary in self-defense (*Pond v. People*, 8 Mich., 150); he need not retreat (*Philips v. Com.*, 2 Duvall (Ky.), 328; *Young v. Com.*, 6 Bush (Ky.), 320; *Bohannon v. Com.*, 8 Am. Rep., 478; *Holloway v. Com.*, 11 Bush (Ky.), 347; see also 2 Bish. Crim. Law, § 644; *Erwin v. State*, 29 Ohio St., 186; *Meridith v. Com.*, 18 B. Mon. (Ky), 49; *Young v. State*, 11 Humph. (Tenn.), 200; *Grainger v. State*, 5 Yerg. (Tenn.), 459; *People v. Batchelder*, 27 Cal., 69; *Tweedy v. State*, 5 Ia., 433; *Haynes v. State*, 17 Ga., 465; *Temple v. People*, 4 Lans. (N. Y.), 119; *Stoffer v. State*, 15

Ohio St., 47; *Johnson v. State*, 27 Tex., 758; *Shorter v. People*, 2 N. Y., 197; *Long v. State*, 52 Miss., 35); he may act in view of the character of his assailant for ferocity (Whart. Crim. Law, §§ 1026–7; *Harrison v. Harrison*, 43 Vt., 417; *People v. Anderson*, 2 Wheeler's Crim. Cas., 390; *Pritchett v. State*, 22 Ala., 39; *Short v. State*, 7 Yerg., 510; *State v. Hicks*, 27 Mo., 590); the burden is on the prosecution to show when the assailed became a wrong-doer, *Ruloff v. People*, 45 N. Y., 220; one who is violently attacked on his own premises by a powerful person who has threatened to kill him, and who kills his assailant while defending himself, is excusable, 2 Arch. Crim. Law, 288–9; *People v. Taylor*, 2 Mich., 250; *Pitcher v. People*, 16 Mich., 142; *People v. Anderson*, 2 Wheeler Crim. Cas., 390; he need not flee from his own house where his family are, *Haynes v. State*, 17 Ga., 465.

GRAVES, J.　This case comes up on exceptions before judgment. The defendant was charged with the murder of Charles Kreiger in November, 1876, and on the trial, which occurred in March, 1877, he insisted that his act was justifiable self-defense. The jury after a protracted trial returned a verdict against him for manslaughter. The Attorney General virtually admits that the conviction cannot be sustained, and he declines to take the contrary position before the court. The record bears him out. A large number of exceptions were taken some of which were valid and others not.

The present attitude of the case renders many questions immaterial which under other circumstances might have a different complexion. As the case stood upon the trial there was room for questions connected with specific issues which the verdict has disposed of forever. The charge of murder is conclusively negatived, and every question merely pertinent to that charge and not relevant to the accusation or defense of manslaughter can have no future importance. As the case is situated, in view of this aspect of it and of the fact that only one

side is heard, and that it must assume a different shape on another trial, a particular discussion now would seem to be altogether inappropriate. A few words are required however. Several important facts were shown which have not been disputed.

Defendant was a farmer living about two miles and a half from Dowagiac, and the deceased had been in his service as a farm hand for about a year and a half. November 2d, 1876, defendant discharged him on the alleged ground of his habit of getting intoxicated and being unsteady. On Saturday, the 11th of that month, the parties settled, and a balance was found in favor of deceased of $10.41. Defendant paid $7 and claimed that deceased had taken and failed to return a powder flask and shot pouch worth $3.25, and observed that he would pay the balance when these articles should be restored. The deceased left shortly after and went to Dowagiac. This was before dinner. In the afternoon the defendant also visited Dowagiac on business. Whilst there he was met by deceased who appeared to be in liquor and was very violent. He complained that defendant would not pay him what he owed him and threatened personal violence, and even went so far as to menace his life. These threats were in different forms, and it was impossible not to understand them as importing a design to visit defendant with great personal harm if not an attack against his life. He was a man of superior strength and vigor, and far more powerful than defendant. His demeanor was so impressive of his purpose and ability to do great harm to defendant that the village marshal interfered and took him away, and informed him that unless he behaved he would lock him up. Subsequently, however, the deceased returned to resume his violence against defendant, and the marshal then placed him in custody of one Rummell, and instructed defendant that he had better go home, as he, the marshal, could not watch deceased all the time, and

defendant accordingly hurried home without having completed his business.

The defendant was building a new house at this time within a few feet of the old one, and one Adams, a painter, and Hess, a carpenter, were there. About five o'clock in the evening, deceased obtained a livery team at Gardner's stable in Dowagiac to go to defendant's place and get his trunk. Young Gardner, a son of the stable keeper, drove the team, and one Cook, a comrade of deceased, accompanied the latter. Both the latter were a good deal in liquor. When they reached defendant's house he was at supper, and Adams and Hess and a farm hand were there. Mrs Lilly and three children and a niece were also there. Deceased and Cook entered and passed up stairs for the trunk. It was then dark. Adams and Hess went out and stood talking about ten feet from the back door of the old house when deceased and Cook emerged with the trunk and started through the passage way between the buildings for the road. Deceased returned very soon and Cook a little later. Hess and Adams had then moved off several feet, and defendant was passing in the direction of the new house. It had become very dark at this time. Deceased immediately advanced towards defendant and demanded his full pay and defendant refused until he should restore the pouch and flask. Deceased continued to approach defendant and threatened him with extreme personal violence unless he paid him "every G—d d—n nickel to-night." Defendant made no movement towards deceased, but told him to "go away and let him alone;" that he "didn't want any fuss with him." Deceased said, "strike me, G—d d—n you," and defendant replied, "I don't want to strike you; I don't want any fuss with you;" and then deceased said, "you will use that on me, will you, G—d d—n you." Defendant answered "I want you to go away and let me alone; don't put your hands upon me," and instantly added *that he must take*

*his hands off and not strike him again.* There was a struggle in the darkness accompanied by words. "Kreiger's voice was angry; Lilly's was excited,—his voice was that of fear." Kreiger then and there received a mortal wound from a common pocket knife in the hand of defendant.

This outline will convey a sufficient idea of the transaction for the present purpose.

Upon the question of defendant's being justified or excused, the judge charged these propositions among others:

"If you find that Kreiger assaulted Lilly with the intention simply to commit upon him an ordinary assault and battery, not amounting to an injury of a permanent character, and that Lilly only so apprehended, the killing would not be justifiable.

If you find that Kreiger assaulted Lilly and threatened to whip him, and that Lilly could have saved himself from all serious harm by retreating or calling for assistance, and the defendant so knew or believed, but that he did not do so; but stood his ground and resisted Kreiger, and in such resistance killed Kreiger, such killing would not be justifiable or excusable.

If Lilly believed that Kreiger came to his premises on the evening of the homicide with the intention of seeking a combat with him, and that he sought him for that purpose and the defendant so knew, then it was Lilly's duty to have avoided Kreiger, and to have avoided such combat by all reasonable means within his power, and if he chose to stand up and resist the assault when he might have avoided it, and in such resistance killed Kreiger, such killing would not be justifiable."

These instructions we think were improper and misleading. In the first place they suggested to the jury an opinion of the court that the facts would warrant a finding of certain matters of which we cannot say there was legitimate evidence, and especially that defendant did not make reasonable efforts to avoid deceased and avert his attack. In the second place they are objectionable on other grounds. They indicated to the jury that whilst defendant had suddenly returned to his home from Dowagiac to avoid the violence of deceased, and

the latter had then repaired to defendant's place and was again threatening defendant as he had threatened him at Dowagiac with mortal violence; and was now attacking him at night at his own door with the apparent purpose of executing these threats, it was incumbent upon him to fly from his habitation where his wife and children were, in order to escape danger instead of resisting the aggressor. Such is not the law. The jury should have been instructed in effect that if they were satisfied that Lilly being at his own house had reason to believe and did believe from Kreiger's previous and present language, manner and actions, and what had already taken place, that it was necessary to inflict the wounds he did inflict upon Kreiger to save his own life or to protect himself from danger of great bodily harm, he was excused. *Hurd v. People*, 25 Mich., 405; see also *The People v. John Doe*, 1 Mich., 451; *Pond v. The People*, 8 Mich., 150; *Patten v. The People*, 18 Mich., 314; *Erwin v. The State*, 29 Ohio St., 186.

In these cases of personal peril the party assailed not only has the legal right to defend himself, but the law supposes it to be his duty to defend himself so far as he has personal capacity, and it does not suppose him to lie under any obligation to remain supine and attempt to shift this duty upon other private persons. And the legitimacy of his act done under color of this right and duty is not made to depend on his believing or not believing at the moment that a call would bring some one else to interfere in his behalf or assume the task and risk of his defense, however it might bear upon the fact of the reality of his belief concerning his danger and his necessity to use the given means of defense. The charge was inconsistent with the view here explained, and it conveyed the idea that if help was within call and that defendant so believed, then his act was not lawful self-defense. Except in special cases no private person is bound in law, even if called on, to defend others, and no one when hotly assailed under circumstances indicating

an intent to take life or do grievous bodily harm is bound to withhold measures proper in self-defense in order to wait for foreign help.

It was admissible to show by Hess and Adams how Kreiger appeared and acted on the occasion of the homicide, and in connection therewith, that his appearance and conduct were then such as to awaken fear in them.

The impression actually made upon them at the time was of force to give color to their verbal descriptions and convey to the jury with greater distinctness and emphasis the way in which the aggressor most probably appeared to the defendant. Again, Kreiger's behavior on the way from Dowagiac to defendant's was rightly provable in the case. It bore upon the representation given of his deportment and that of his comrade when they reached the residence of defendant and when he made his attack.

It is very probable that the future exigencies of the case will be fully satisfied by what has been said, and the reasons given previously explain the difficulty felt in regard to any minute examination or general discussion.

We are satisfied with the doctrine of *Pond v. The People*, *Patten v. The People* and *Hurd v. The People*, supra, and the case is fairly ruled by the principles laid down and recognized there.

The conviction must be set aside, and as the record reads we do not feel authorized to advise a release of the defendant without a finding by another jury.

We must therefore advise a new trial.

The other Justices concurred.