## THE STATE v. THOMPSON.

1. **Homicide:** EVIDENCE JUSTIFYING: SELF-DEFENSE. Defendant, a man of fifty-three years, was the owner of a tract of land over which there was a wagon way which had been used by the public by permission of the owner, but not by any right. Defendant, in fencing his land, was in the act of building the fence across this wagon way, when the decedent, a young, vigorous and bullying man, came up with a wagon and insisted on going through, and over the land. To this defendant objected. Decedent jumped from his wagon, went upon defendant's land, threatened to tear the fence down, and began to do so, and declared that he would go through or do defendant serious injury. When first approached, defendant had his axe in his hand, but he laid it down and picked up a club. After parleying with decedent, and fearing injury from him, defendant stooped to lay down the club and pick up the axe, intending to go away to his house in order to avoid further trouble and probable danger. As he was stooping, decedent punched him with a fence stake, and was raising the stake as if to strike him, when defendant picked up another club lying near and struck decedent a blow from which he afterwards died. Decedent had threatened that if defendant fenced up that road he (decedent) would go through or kill defendant, and defendant had knowledge of these threats. *Held* that the act of defendant was justifiable on the ground of self-defense, and that a verdict of manslaughter could not be sustained under the evidence,—which is fully set out in the opinion.

*Appeal from Jasper District Court.*

FRIDAY, MARCH 18.

THE defendant was indicted for the crime of murder in the second degree. He was tried and convicted of manslaughter, and sentenced to imprisonment in the penitentiary for one year. He appeals.

*Winslow & Varnum,* for appellant.

*A. J. Baker, Attorney-general,* for the State.

ROTHROCK, J.—It appears from the evidence that the defendant is the owner of a small tract of land, consisting of twenty-three acres. He purchased it some time prior to July 19, 1884. The land was covered with brush and tim-

ber. For some years before defendant acquired the land, a way had been used for travel over the same. The defendant commenced to improve his land by removing the brush and timber. He built a cabin, and removed his family into it He built fences, and, in order to inclose the land, it became necessary to fence across the said way. He did not build a solid fence across the way, but constructed bars, which could be removed to allow teams and wagons to pass through, if it became necessary to do so. It was thought this necessity might arise in case of teams drawing loaded wagons, as the way around the land was not so good as that through it. It is conceded, and the court instructed the jury, that there was no lawful highway through the defendant's land, and that he had the right to inclose the same and stop travel thereon. It was known through the neighborhood that the defendant intended to build a fence across the way. No one appears to have made any marked opposition to it, except one Isaiah Fenderson, who was a tenant upon land in the neighborhood, but who intended to move away in a short time. Fenderson was violently opposed to having the way closed up. He made threats among the neighbors that, if the defendant did fence across the way, he (Fenderson) would go through or he would "riddle him," and that he would "wade in blood up to his knees" to go through, etc. Some of these threats were communicated to the defendant before he put the bars across the way. On the same day that the bars were erected, and while the defendant was at work near the bars, Fenderson approached with a team and an empty wagon, and demanded his right to go through and over the defendant's land. The defendant directed him to drive around the land. Fenderson become very angry, and leaped from his wagon, attempted to tear down the bars, and crossed over upon the defendant's land inside the inclosure, and an altercation ensued, in which the defendant struck Fenderson upon the head with a club, and fractured his skull, from which injury he died in two or three days thereafter. There

was no eye-witness to the final struggle between the parties. A young man named Joseph Thompson was with the deceased in the wagon, and he testified as a witness on the trial that when Fenderson stopped at the bars the defendant was standing near by, and, to Fenderson's statement to defendant that he was shutting up the road, the defendant directed him to go around his land; that Fenderson jumped out of his wagon, and approached the fence, and said he would go through there, and defendant told him he would not go through, and to go away; that he did not want any trouble with him. The witness took hold of Fenderson and pulled him, and tried to persuade him to drive around,—that they could do so as well as others. Fenderson persisted, and jumped over the fence, took hold of the fence stakes, and spread them apart. When deceased jumped the fence the defendant had an axe in his hand, and said, "I will not draw the axe on you," and he picked up a club, and held the same in his hands, and told the deceased not to touch the fence. Fenderson was spreading the stakes of the fence apart, and the parties were cursing each other, and about six feet apart, when the young man turned away and walked off, for the reason, as he stated, that he believed there would be trouble, and he did not want to see it.

There is no doubt that the death of the deceased was caused by a blow from a club or stick, and that the blow was inflicted by the defendant. The defendant insists, however, that all of his acts in the unfortunate affray were excusable on the ground that they were done strictly in defense of his person. And, as we believe that his claim is well founded, it appears to be necessary to set out further facts in the case quite fully, and these facts are so fully detailed in the testimony given by the defendant as a witness upon the trial that we here insert it in full. It is as follows:

"I am the defendant, and am fifty-three years old past. I reside on twenty-three acres of land that has been described by the various witnesses. Moved there a year ago the

twenty-first of April.   I improved the piece myself.   I
cleared out about three acres of ground, and put it into corn
and potatoes and beans and small vegetables.   I moved the
house on the land, and moved the family in the same day.
The neighbors helped me move the house, and I put it up
and the family in at the same time, and this last summer
have continued to improve the place.   I built outside fences
to inclose the land.   Started to fence on the south side with
a pole and brush fence.   I commenced at the east end, cut-
ting the brush out west along the line, or what I supposed
to be the line, and cut up until I got to the hog lot.   Then I
went back, and commenced to fence on the east line.   The
fence was made of poles with crotches, and poles set on
the crotches.   The pole fence was on the east end.   I saw
Isaiah Fenderson on or about the nineteenth day of July,
1884.

"The first I saw him was in the morning, passing down
through the timber where I was at work on the west line,
when I was going to get some sticks that I was splitting out
of some limbs.   I was on the west side of the traveled way,
cutting sticks.   He went south-east towards his house, down
along the traveled way.   Joseph Thompson was with him.
I kept on with my work, got my sticks out that I needed,
and fetched them back, and went to work at the fence.
When Fenderson came back it was all finished up to putting
on the riders about, but the bars.   I was putting up a pair of
bars for teams to pass through the field if they found it
necessary.   Taking down the bars, and putting them up
again, and driving through, it was all right, and I was driv-
ing some stakes in by these bars.   Fenderson came back.
He had a team and empty wagon so far as I could see.
They drove within about twenty feet, I should judge, of
where I was at work.   Fenderson said, 'You are fencing up
the road.'   I said, 'No; there is the road; travel it.'   And
he commenced cursing me.   He said he would tear it down
and go through there.   He was then in the wagon.   He

The State v. Thompson.

jumped out of the wagon when he said that, off on the east side,—that would be on the left side of the wagon. He came to the fence to me on the north side of it. It was inside of my own field. He came up to the fence and said he was going to tear it down. I told him not to. He said he was going through there or 'I will come and pound the G—d d—d —— out of you.' I had my axe in my hand, and he says, 'Don't strike me with the axe.' I said, 'No, I would not strike any one with the axe.' Then he jumped the fence and came over to me, and I said, 'Go away. I don't want to bother with you.' And Joseph came and pulled him by the coat-tail, and said, 'We can travel that road if any one can.' And he says, 'No, by G—d, I am going through there;' and then Joseph went away up through the woods. I tried to reason with him about the road,—that, if I was violating the law, I told him, to take the law on me; we would not quarrel about it; he had no interest there much,—there was no use of bothering himself about it. He had told me he was going to move away. He said, 'By G—d, he had an interest in there; he was going through there;' and I said, 'Isaiah, there is no use talking;' and he swore some, and I swore some, and I said, 'I will not bother with you,' and I made one step.

. "We was, I should judge, six or seven feet apart at the time this parleying went on, and we were on the north side of my own land, and on the east side of the traveled track. My back would be to the north-east, and he was facing me. He was then standing right close to the east fork of the bars. He kind of stepped back after he made that advance on me, and put his hand on the fence stakes, that way. [The witness here showed movement made in the attempt to pull the stakes apart.] He spead them apart. The one on the south side was driven in pretty firm, and the other one I hadn't driven in yet. I wanted them to hold up the heavy poles I was putting on for riders. I said, 'Isaiah, I won't bother with you. I will go on with my work.' And I made a turn of the hand to pick up my axe, and I spied a club on the ground,

and I dropped the club on the ground that I had in my hand to pick up my axe, and just with that he grabbed the stake and gave me a jab, this way. [Witness here showed movement made by Fenderson in punching him with the stake, withdrawing the club, and raising it as if to strike him.] I just picked up the stick, and gave him an underhanded lick, that way, with my right hand. I hit him that way. [Witness here shows by his movements that he struck him with an upward blow as he rose from the ground in picking up the stick, so that he struck upward, being under and lower than the deceased.] I never struck him but once. He says, 'Don't strike me again;' and I says, 'No Isaiah, you provoked me to this. You was trying to punch my guts out, and then you tried to knock my brains out.' He says, 'I will have your heart's blood for that.' I never made any reply to that; and he wheeled short, turned the wheels right to the buggy, and started away to where he lived as fast as he could go, and I heard the wagon stop, and then I started home as fast as I could go. Before this occurrence I had been told by neighbors that Fenderson had made threats against me. William Bullock told me, and Mr. Crews told me. This was told me the day before the trouble."

"*Cross-Examination.* Bullock met me in the road, and said, 'I understand you are going to fence this road up, Aleck.' I told him I was; but I would have bars there so the people could pass through that wanted to. 'Well,' says he, 'you had better not fence it up.' I said, 'Why?' He said that he and Fenderson had a big row about that road. Fenderson threatened him pretty hard, he said, and he said he came pretty near knocking his head off, or something to that effect. And he says, 'You will have trouble with Fenderson.' In that same conversation I had, he said that Fenderson said he would go through there or riddle me, or something to that effect. That is as near as I can tell it. Crews said to me one day, 'Ain't you afraid to work in here?' I asked him 'What will make me afraid?' He says, 'Fender-

son has threatened you hard, and he is drinking, too.' I said, ' I guess he will not hurt me.' He says, ' Why, you had better look out;' and I asked him what he said about fencing the road up. He says, ' He says all he wants is one good clip at you.'

" I said Fenderson jabbed me with a stick. It was quite a good sized-stick. May be two and a half inches at the butt, and perhaps somewhere in the neighborhood of six feet long. That was one of the sticks I was using to build the fence with,— one of the stakes I drove in the ground. It was a round stick, and had been part way driven in the ground. He loosened it up before he jerked it out. At this time I had thrown down the axe. He jerked the stick out as I was going to pick up the axe. I was going to pick up the axe and leave him. I told him not to bother me; I didn't want to bother with him at all. I had a club in my hands, and was just stooping down to pick up my axe and go away. I kept my eye on him, for I thought he would get away with me anyway. When I dropped the club out of my hand I had no idea he was going to strike till he came up; I thought if I would go away he would quit and let me alone, and I thought I would drop the weapon I had in my hand and get away. Before I dropped my club he had his hand on the stake. I then thought it was best to drop the stick and go away. I thought it was the best thing for me to go away and take my axe home. He was mad, furious and excited. Before I picked up the axe, as I told you, I seen he was going to get away with me. I was going to run, because I said I would have no fuss with him.

" *Question.* Why did you not run with the stick instead of the axe? *Answer.* I wanted to take my axe home with me. I wanted to go up near the house and chop. I wanted to work with the axe, and not to use it on him by any means. As soon as I stooped down, he prodded me. I made a movement, and dropped the club down and took the axe, and I seen him coming, and I dropped the axe and took the club,

and hit him an under-handed lick. I had stooped down to pick up the axe, and, as I raised up, I took him that way, by striking him as I raised up. *Q.* Had he the club raised? *A.* He had it raised this way, [showing manner. Witness here showed that he had the club raised as if to strike him over the head.] I struck him with the club as I raised up. As I raised up I let it flicker, after I seen that, if I did not, I was a goner. He fell onto his knees. He said, ' Don't hit me again,' and I said I would not if he would let me alone. He hurt me considerably when he jabbed me,— gave me a pretty good jab with it. He struck me here in the side. I expect he would have put it pretty nearly into me if he had been a little closer. He was too far off to have good force at me. When he was down on his knees he got up just as quick as he could. Was not more than down till he was up. I expect we was both excited. I was not very angry, because I had my mind made up that I would not quarrel with him. He jabbed me with the stick just as I stooped down. He was next the fence, facing me. When he jabbed me he must have just grabbed the stick, and then jabbed me with it, and then when he did not get me down, he raised it up this way in his hand; I cannot tell you whether the right hand or left hand in advance; but the stick was raised up in this way, coming onto me; I would not say whether the right or left hand. When he jabbed me I could not tell which hand was in advance. I was stooping down picking up the axe to get off, when he gave me a jab, and I picked up the stick, as I have said. He pulled the stake loose out of the fence. It was a stick that I was using,—driving in,—as I told you before, when he came up to me. The stake that he pulled out of the fence was one he used during the difficulty; and when he was struck he dropped the stick down. I did not do anything with it at that time. After the difficulty, a little spell, I took the little boy and girl to fix up the fence, and I done so, and used the same stick. I would not say whether I put the stake in the same place or not. When I

struck him I did not see any blood, not till I went back to the fence. I noticed no blood when he traveled off. There was a few drops of blood on some chips back next to the fence. This was in the neighborhood where he fell, and I believe there was one or two little drops of blood on the stick that he had. I think there was. When he dropped the stake it was near where the chips were, and it was there when I picked it up and put it back in the fence. I am right-handed. Don't very often use my left hand. I struck him with one hand,— my right hand."

It should further be stated that it appeared from the evidence that the deceased was a young, active and vigorous man. We have examined the record with great care, and we fail to find any evidence in any way impeaching or contradictory to the testimony of the defendant. Indeed, so far as the previous threats of the deceased are involved, the defendant's testimony was fully corroborated. And the young man who witnessed part of the affray also fairly corroborates the account of it given by the defendant. He is also corroborated by the fact that he received quite a severe injury in the side during the affray. In our opinion, the evidence in the case shows without conflict every legal requirement to constitute a complete self-defense. We are aware that human life should be regarded by courts and juries with jealous care, and criminal homicides should surely be punished. But the right of self-defense should also be protected and guarded. It does not necessarily follow that the person who kills his assailant is a criminal. It plainly appears from the evidence in this case that the defendant did not intend to kill the deceased. If such had been his intention, he would not have laid down his axe, and stood six feet away from the deceased, as when last seen by the young man named Thompson. The deceased had then crossed over the fence upon the defendant's premises. It must be remembered that the defendant had the legal right to fence up this way. It cannot be claimed that, because he knew the deceased had

threatened him with violence, he should be required, to appease the wrath of a bully, to leave his land uninclosed. The law would be no protection to him if he could not be allowed to improve and inclose his humble home in his own way. And he had the right to stand by his fence and contend that his premises should not be invaded; and, when assaulted and wounded as he was, he had the right to strike back, if it appeared to him as a reasonable man to be necessary to protect himself from further great bodily injury. That the necessity existed, there can be no doubt, if the case is considered upon the evidence.

In our opinion, a new trial should have been granted, upon the ground that the evidence did not warrant the verdict found by the jury.

REVERSED.