STATE OF IOWA, Appellee, v. J. S. SIPES, Appellant.

**HOMICIDE:** Excusable or Justifiable Homicide—Self-defense—Non-duty to Retreat. One who is subjected to a felonious assault not provoked by him is under no duty to retreat if the assault is committed on him while he is in his home, office, or place of business, or on property lawfully occupied by him. (See Book of Anno., Vol. 1, Sec. 12922, Anno. 41 *et seq.,* 133 *et seq.*)

**HOMICIDE:** Excusable or Justifiable Homicide—Standard of Action. An "ordinarily prudent and *cautious*" man is the standard set by the

law as a condition for exercising the right of self-defense, and not an "ordinarily prudent and *courageous*" man.

**CRIMINAL LAW:** Trial—Instructions—Inferential Duty to Convict. Reversible error may result from instructing, in effect, that "a doubt, to *justify* an acquittal, must be reasonable." (See Book of Anno., Vol. 1, Sec. 13917, Anno. 10.)

**HOMICIDE:** Malice—Non-conclusive Presumption—Instructions. Reversible error results from instructing that "malice" is *conclusively* presumed from a deliberate and intentional killing, when the record reveals a plea of justification and excuse, and supporting testimony relating thereto. (See Book of Anno., Vol. 1, Sec. 12910, Anno. 21 *et seq.*)

**HOMICIDE:** Murder—Essential Elements—Instructions. Instructions should not lead a jury to understand that (1) premeditation, (2) deliberation, (3) malice aforethought, and (4) intent to kill need not exist *prior* to the striking of the fatal blow, but may exist at the *very time* of striking the fatal blow. (See Book of Anno., Vol. 1, Sec. 12911, Anno. 8 *et seq.*)

**CRIMINAL LAW:** Trial—Instructions—Inadequate Enumerations of Elements. Instructions which direct the jury to convict on proof of named elements of an offense are prejudicially erroneous when not *all* the elements of such offense are enumerated.

**CRIMINAL LAW:** Change of Venue—Discretion of Court. Principle recognized that the granting or refusing of a change of venue rests in the discretion of the court.

Headnote 1: 30 C. J. pp. 71, 72. Headnote 2: 30 C. J. p. 372. Headnote 3: 17 C. J. p. 343. Headnote 4: 30 C. J. p. 345. Headnote 5: 29 C. J. p. 1111; 30 C. J. p. 348. Headnote 6: 16 C. J. p. 1047; 30 C. J. pp. 340, 347. Headnote 7: 16 C. J. p. 204.

*Appeal from Clay District Court.*—JAMES DELAND, Judge.

JUNE 21, 1926.

Defendant was convicted of murder in the first degree. From a judgment entered thereon he appeals.—*Reversed and remanded.*

*Heald, Cook & Heald* and *LeRoy A. Rader,* for appellant.

*Ben J. Gibson,* Attorney-general, *Neill Garrett,* Assistant

Attorney-general, and *C. W. Baldwin,* County Attorney, for appellee.

ALBERT, J.—Only so much of the record will be referred to as is necessary to a fair understanding of the questions raised.

Appellant was the owner of a public garage in the town of Spencer, Iowa, at the time in controversy. The deceased, Daniel Detling, and a companion, one Harvey Howell, drove a Ford

1. HOMICIDE: excusable or justifiable homicide: self-defense: non-duty to retreat.

automobile into appellant's place of business. They had previously left the cushions of the car at some distance from the garage, and, as it threatened to rain, appellant carried them into his garage. Detling and Howell were indebted to appellant for a bill for repairs on the car amounting to approximately $6.50. After they entered the garage, appellant advised them that he had carried in their cushions, and they proceeded to take the cushions and put them into the car. Appellant told them that they could not take the cushions until they paid the bill. They had some words over this, and it is undisputed that Sipes said to them:

"Well, boys, take the car and get out with it, because I don't want to have any trouble over a small account. Take your car, and go on out."

Howell replied:

"We will take the damn car and get out when we get ready."

Sipes said:

"Well, I will take the key, and put the car in a stall, because I don't want it in the driveway."

Howell and appellant then started toward the car, one on each side. When they reached it, each leaned into the car, ostensibly to get the key. While appellant was in this position, Detling grabbed him by the collar and pushed him back from the car against a battery, or workbench, on which lay a knife in its scabbard. Detling and Sipes both reached for the knife, and Detling got the scabbard, while Sipes got the knife. Detling dropped the scabbard, and grabbed something else off the bench which looked like a wrench. Sipes says: "It looked to me to be longer than a knife." Detling raised what he had in his hand, to hit Sipes, and then Sipes struck him with the knife. It pene-

trated Detling's heart, and he died shortly afterward. This, briefly, is Sipes's account of the tragedy, and it is by reason of this testimony that an instruction was called for and given by the court on the theory of self-defense. The instruction reads:

"And his claim is that in what he did he was acting in self-defense. * * * But before one is justified in taking life in self-defense, it must be, or it must reasonably appear to be, the only means of saving one's life, or of preventing great bodily injury. If it is evident to the assaulted that the danger which appears to be imminent can be avoided in any other way, as by retreating from the conflict, the taking of the life of the assailant is not excusable. And if you shall find from the evidence in this case that, just before the defendant killed Daniel Detling, he had been unlawfully assaulted by the said Daniel Detling, and that, from the character of said assault and the weapon used, he had reason, as an ordinarily prudent and courageous man, to believe, and did in good faith and honestly believe, that he was in danger of being killed or suffering great bodily injury, and that the parties were so situated that he could not have retreated, or that he could not reasonably have expected to have preserved his life or protect himself from injury by retreating, then and in that case he was justified in using such force and such means to protect his life and person as may in good faith then have appeared necessary to him, as an ordinarily prudent and courageous man, under all the circumstances then surrounding him, even to the taking of life. * * *"

It is seriously asserted that this instruction does not correctly state the law in relation to the duty of the appellant to retreat. It is insisted that, under the circumstances herein, there was no duty on the part of appellant to retreat.

The ancient common-law rule, often spoken of as "retreat to the wall," is that a person is not justified or excused in killing one who attacks him unless he first retreats as far as he can do so without increasing his real or apparent peril. 30 Corpus Juris 68, Section 239. Modern legal thought, however, has modified this rule and narrowed the application of it. In 3 Rice on Evidence 574, Section 360, it is said:

"A very brief examination of the American authorities makes it evident that the doctrine as to the duty of a person assailed to retreat as far as he can, before he is justified in re-

pelling force by force, has been greatly modified in this country, and has with us a much narrower application than formerly. Indeed, the tendency of the American mind seems to be very strongly against the enforcement of any rule which requires a person to flee when assailed, to avoid chastisement or even to save human life; and that tendency is well illustrated by the recent decisions of our courts bearing on a general subject of the right of self-defense.''

In *Runyan v. State*, 57 Ind. 80, it is said:

''The weight of modern authority, in our judgment, establishes the doctrine that, when a person, being without fault, and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force; and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable.''

Turning to the decisions of our own state, we find that the later decisions are disposed to follow the rule above quoted. It is quite the universal rule that, where the person is in his own house, or, as denominated by common law, in his castle, he is not bound to retreat when feloniously attacked. We have made this pronouncement in this court in *State v. Middleham*, 62 Iowa 150; *State v. Bennett*, 128 Iowa 713; *State v. Leeper*, 199 Iowa 432. See, also, *Willis v. State*, 43 Neb. 102 (61 N. W. 254).

The consensus of authority, without a dissenting vote, seems to be that, where homicide is committed in defendant's own office or place of business, the same rule applies as though he were in his dwelling house. *Foster v. Territory*, 6 Ariz. 240 (56 Pac. 738); *Enyart v. People*, 67 Colo. 434 (180 Pac. 722); *State v. Bowers*, 122 S. C. 275 (115 S. E. 303); *State v. Laura*, 93 W. Va. 250 (116 S. E. 251); *Tingle v. Commonwealth* (Ky.), 11 S. W. 812; 30 Corpus Juris 71, Section 243, with a note containing many more cases.

In the *Laura* case, supra, the court submitted to the jury the question of whether the place where the homicide occurred was the dwelling house or habitation of the defendant. It was urged that this was error, because the doctrine of retreat did not apply to the place of business of the defendant. The court says:

''Besides, defendant's rights in cases of this kind are not limited strictly to his dwelling house. His right to defend his person and his property extends to his place of business also;

and he is equally entitled to stand his ground and to defend his person and property against the invasion and assault of an intruder, even to the taking of human life, if that becomes necessary. In this case, the only home which defendant had was located in the hotel or rooming house, and in the building in which he did business; and he had the right to protect himself against the unlawful incursion and assaults of * * * Hall or of any other intruder. * * * That this right of self-defense, pertaining to one's castle, extends also to his place of business has been decided in a number of cases, referred to in a note to *Morrison v. Commonwealth* (Ky.), 67 L. R. A. 539, 545."

In the *Enyart* case, supra, the defendant was president of the First National Bank, and homicide was committed in the bank building. The court's instructions are criticized in relation to the question of duty to retreat, and the Colorado Supreme Court says:

"Such is the ancient doctrine of 'retreat to the wall,' but it has long since been abandoned in the Federal and most of the state courts" (citing authority).

The court cites its own case, in which it said:

"As to this doctrine of retreat, it may, in general, be safely said that the tendency of the modern cases is greatly to qualify the common-law rule. * * * But when a defendant is where he has a right to be * * * and is assaulted by the deceased in a way that defendant honestly and in good faith believes, and the circumstances being such as would induce a like belief in a reasonable man, that he is about to receive at the hands of his assailant great bodily harm, or to lose his life, the defendant, if he did not provoke the assault, * * * is not obliged to retreat or flee to save his life, but may stand his ground, and even, in some circumstances, pursue his assailant until the latter has been disarmed or disabled from carrying into effect his unlawful purpose; and this right of the defendant goes even to the extent, if necessary, of taking human life."

In the *Foster* case, supra, the court instructed, in part:

"If the defendant could have withdrawn from the danger, it was his duty to retreat. This means that, between his duty to retreat and his right to kill, the defendant must avail himself of any apparent and reasonable avenue of escape by which his

danger might be averted, and the necessity of slaying his adversary avoided.''

In reversing the lower court for giving this part of the instruction, the Supreme Court of Arizona says:

''An examination of the reported cases bearing upon this point has convinced us that the instruction does not state the law of self-defense as now defined and set down by the more modern American authorities.''

After discussing authorities, the court concludes:

''We find from these authorities, as well as others which might be cited, the distinction is made and sharply defined between the case of one who is, at the time of the assault, upon his own premises, and one who is not. To use the language of the California court, 'Whatever diversity of opinion may be found in the books on the general proposition of the duty of retreat, the right to stand one's ground when assailed in one's own home or upon one's own premises was never seriously questioned, even by the common-law writers.' ''

Where the homicide occurs on the property owned or rightfully occupied by the defendant, but outside of his dwelling house or place of business, the same rules have been applied. *State v. Thompson,* 71 Iowa 503; *State v. Bennett,* 128 Iowa 713; *State v. Rutledge,* 135 Iowa 581; *Haynes v. State,* 17 Ga. 465; *Smith v. Commonwealth* (Ky.), 26 S. W. 583; *People v. Lilly,* 38 Mich. 270; *Bearden v. State,* 44 Tex. Cr. 578 (73 S. W. 17); *State v. Cushing,* 14 Wash. 527 (45 Pac. 145); *Fields v. State,* 134 Ind. 46 (32 N. E. 780); *State v. Gordon* (S. C.), 122 S. E. 501.

In the *Cushing* case, supra, defendant had asked an instruction stating that, if he was on his own premises, but outside of his dwelling house, he was not bound to retreat. The instruction given read:

''Before a person can justify taking the life of a human being by self-defense, he must employ all reasonable means within his power, consistent with his own safety, to avert the necessity for the killing.''

The court says:

''We think that this instruction, in connection with the entire charge, might reasonably have tended to create the impression upon the minds of the jurors that it was the duty of

the appellant, notwithstanding that he was upon his own premises, where he had the lawful right to be, to retreat from any assault then being made or threatened by the deceased; and this impression is strengthened by the fact that the instruction requested by the appellant and refused by the court contained a correct statement of the law upon the subject, as laid down by the Supreme Court of the United States in the case of *Beard v. United States,* 158 U. S. 550 (15 Sup. Ct. 962) [and other cases cited]. * * * Not only does the instruction under consideration contain a correct statement of the law, but it was applicable to the evidence, and it was the right of the defendant to have it or some equivalent instruction submitted to the jury.''

In the *Lilly* case, supra, the court instructed the jury that it was the duty of the defendant ''* * * to have avoided Kreiger [the deceased], and to have avoided such combat by all reasonable means within his power, and if he chose to stand up and resist the assault when he might have avoided it, and in such resistance killed Kreiger, such killing would not be justifiable.'' In commenting on this instruction, the Supreme Court of Michigan said:

''The jury should have been instructed, in effect, that, if they were satisfied that Lilly, being at his own house, had reason to believe, and did believe, from Kreiger's previous and present language, manner, and actions, and what had already taken place, that it was necessary to inflict the wounds he did inflict upon Kreiger, to save his own life or to protect himself from danger of great bodily harm, he was excused [citing cases]. * * * In these cases of personal peril, the party assailed not only has the legal right to defend himself, but the law supposes it to be his duty to defend himself, so far as he has personal capacity, and it does not suppose him to lie under any obligation to remain supine and attempt to shift this duty upon other private persons.''

In the *Smith* case, supra, the defendant and the deceased lived on adjoining premises, with a fence between the two buildings. The killing occurred in front of the house of the accused, at the steps that led into the yard of appellant's house. The court said:

''The accused was at his own home. * * * He was not compelled to flee, or hide in his own house, to avoid the presence of

one who, but a moment before, had attempted to take the life of his brother, and had also threatened to take the life of the accused. The instruction should have been so framed as to have said to the jury that the accused had the right to defend his brother and himself, and was not compelled to look for means of escape when on his own premises, if he believed, and had the right from the testimony to believe, that the deceased was about to enter his yard for the purpose of doing either his brother or himself great bodily harm."

One of the leading cases in the United States on this question is *Erwin v. State,* 29 Ohio St. 186, where all the English cases and a large part of the cases in this country are quite thoroughly reviewed. The court sums up its conclusion as follows:

"It is true that all authorities agree that the taking of life in defense of one's person cannot be either justified or excused, except on the ground of *necessity*; and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity if he brings it upon himself. The question, then, is simply this: Does the law hold a man who is violently and feloniously assaulted responsible for having brought such necessity upon himself, on the sole ground that he failed to fly from his assailant when he might have safely done so? The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life, where the assault is provoked; but a true man who is without fault is not obliged to fly from an assailant who, by violence or surprise, maliciously seeks to take his life or do him enormous bodily harm."

In *Beard v. United States,* 158 U. S. 550 (39 L. Ed. 1086), Justice Harlan, speaking for the United States Supreme Court, says:

"Upon a full review of the authorities, and looking to the principles of the common law, as expounded by writers and courts of high authority, the Supreme Court of Ohio held that the charge was erroneous."

And again, quoting from *Runyan v. State,* 57 Ind. 80, he says:

"A very brief examination of the American authorities makes it evident that the ancient doctrine as to the duty of a

person assailed to retreat as far as he can, before he is justified in repelling force by force, has been greatly modified in this country, and has with us a much narrower application than formerly."

The opinion then proceeds to review the English cases and text-writers, and concludes:

"In our opinion, the court below erred in holding that the accused, while on his premises, outside of his dwelling house, was under a legal duty to get out of the way, if he could, of his assailant. * * * The defendant was where he had the right to be, when the deceased advanced upon him in a threatening manner, and with a deadly weapon; and if the accused did not provoke the assault and had at the time reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life or do him great bodily harm, he was not obliged to retreat, nor consider whether he could safely retreat, but was entitled to stand his ground and meet any attack made upon him with a deadly weapon, in such way and with such force as, under all the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, was necessary to save his own life or to protect himself from great bodily injury."

Again, in *Alberty v. United States*, 162 U. S. 499 (40 L. Ed. 1051), the doctrine of the *Beard* case is reaffirmed, and the court says:

"The only difference suggested is that in that case the attack was made with firearms, and in this case it would appear that the defendant supposed that the deceased was about to attack him with a knife. * * * Under such circumstances we think that a charge to the jury that he was bound to retreat as far as he could, or disable his adversary without killing him, was misleading. We think that a man who finds another trying to obtain access to his wife's room in the nighttime, by opening a window, may not only remonstrate with him, but may employ such force as may be necessary to prevent his doing so; and if the other threatens to kill him, and makes a motion as if to do so, and puts him in fear of his life, or of great bodily harm, he is not bound to retreat, but may use such force as is necessary to repel the assault."

In *State v. Thompson*, 71 Iowa 503, the defendant and the deceased had some difficulty over a line fence. Defendant was

standing on his own side of the fence, and the deceased on his side, when the difficulties arose. The deceased attempted to tear down part of the fence and cross over onto defendant's premises. Defendant struck him over the head with a club, and fractured his skull, from which injury he later died. The court said:

"It must be remembered that the defendant had the legal right to fence up this way. It cannot be claimed that, because he knew the deceased had threatened him with violence, he should be required, to appease the wrath of a bully, to leave his land uninclosed. The law would be no protection to him if he could not be allowed to improve and inclose his humble home in his own way. And he had the right to stand by his fence and contend that his premises should not be invaded; and, when assaulted and wounded as he was, he had the right to strike back, if it appeared to him, as a reasonable man, to be necessary to protect himself from further great bodily injury. That the necessity existed, there can be no doubt, if the case is considered upon the evidence."

In the case of *State v. Bennett*, supra, the altercation took place on defendant's premises. The court instructed the jury that defendant, acting in self-defense, " 'must not use more force than is necessary, nor use dangerous or deadly weapons or attempt to kill the assailant, unless the danger is imminent and the necessity to use such weapon is urgent and could not be avoided by retiring from such danger.' The appellant contends that the general rule that a person assaulted must retreat, if he may safely do so, before taking the life of his assailant or inflicting a great bodily injury upon him, is not applicable to this case, because the defendant was on his own premises, and was therefore not bound to retreat from the threatened assault of Colwell. We think the appellant's contention is sound."

Reference is then made to the case of *State v. Jones*, 89 Iowa 182, and cases therein cited. The court continued:

"But none of the latter cases decide the exact point involved here, which is, briefly, whether a person while on his own premises must retreat from a felonious assault. It is the universal rule that the dwelling house is the castle, and that no retreat is necessary therein; and we see no sound reason for holding that a greater obligation exists when the accused is on his own prem-

ises, where he has a right to be, and which constitute a part of his residence and home.''

In the case of *State v. Rutledge,* supra, the altercation took place on defendant's premises, but outside of his house. Defendant asked for an instruction stating that, under the facts, he was not bound to retreat, which instruction was refused. Of the instruction given by the court it is said:

''It spoke in a general way of defendant's duty to retreat when assailed,—that is, as to whether he or the deceased retreated during the progress of the affray,—and, although specifically requested by the defendant to charge that he (defendant) was not, under the circumstances, compelled in any event to retreat, but might stand his ground, failed to give the jury any light upon this situation. In this we think there was error. As said, defendant was upon his own premises, and practically in his own home. He had warned deceased not to come back; but, in spite of the warning, he came, and, under defendant's version of the testimony, assaulted him with a deadly weapon, or was on the point of doing so, when deceased did the cutting. In such circumstances, if true, defendant was not compelled to retreat, and was justified in standing his ground; and the jury should have been so instructed.''

The opinion cites the *Middleham* and *Bennett* cases, above cited.

One of our later decisions, *State v. Borwick,* 193 Iowa 639, touches this question. In that case the tragedy occurred on the public highway, and the case was made to turn on the proposition that the deceased was rightfully on the public highway. The opinion says:

''\* \* \* we think it no undue stretch of the principle to hold that the car is (in a restricted sense, perhaps), for the time being, his castle; and if, while therein, he is violently attacked, in a manner involving serious danger both to himself and his companions, he has the right to exert himself to the utmost for their common defense and protection.''

The last time this court gave expression on this matter was in *State v. Leeper,* 199 Iowa 432. In the *Leeper* case, the person was assaulted in his own dwelling; but, under the pronouncements we have made, the same rule would apply when he was

assaulted in his garage, or on his own property. We said, in the *Leeper* case:

"It is universally recognized that one assaulted in his own dwelling, under such circumstances as to create in him, as a reasonable man, a justifiable belief that his life is in danger or that he will sustain a great bodily injury, is not bound to retreat before killing his assailant. * * * And the fact that the assailant is also an occupant of the home, with an equal right there, does not put upon the one assaulted any duty to retreat."

To put it more succinctly, under our holdings we have placed a man's home, his office, or place of business, and the property owned or lawfully occupied by him, all under the same rule; and it must follow, as a direct conclusion from the aforesaid lines of authority, that, where one is feloniously assaulted while in any of these places, he is not bound to retreat. If we apply this rule of law to the instruction given, it shows that the instruction is erroneous. Under the facts in the case, and the theory of self-defense contended for by appellant herein, this instruction should not have contained any statement that appellant was bound to retreat. He was entitled, in the submission of his theory of the case, to have a correct statement of the law governing self-defense; and this instruction did not contain such statement.

There are some different expressions in our earlier holdings, and, in fact, some of such holdings are not exactly in line with the rulings here announced; but we are satisfied that the rules here announced are in line with our later decisions and with the general current of modern authority.

Another attack is made on this instruction on the ground that appellant is required to act as an "ordinarily prudent and courageous man." Complaint is made about the use of the word "courageous." The word should have been omitted. The term ordinarily used under such circumstances is "ordinarily prudent and cautious man."

2. HOMICIDE: excusable or justifiable homicide: standard of action.

A serious attack is made on the instruction defining reasonable doubt, given by the court. We do not care to enter into the polemic field as to what is a correct definition of "reasonable

3. CRIMINAL LAW: trial: instructions: inferential duty to convict.

doubt." Many different shades and disagreements of ideas exist among the courts, and even among the text-writers, on this question. There are certain forms of definitions of this term in the Iowa Reports that have been repeatedly approved, and it is best for courts to follow these approved forms. There is one phrase used in this instruction, however, to which we wish to call attention. Among other things, it states, "A doubt, to justify an acquittal, must be reasonable." We have repeatedly cautioned against and condemned the use of the word "justify," as used in this instruction. In *State v. Comer*, 198 Iowa 740, we said:

"In view of these repeated pronouncements by this court, there is no excuse for a trial court in this state to give this instruction. There is no justification in any case for a trial court to give a disapproved and improper instruction, even though it may not be the basis of a reversal. Instructions should be given correctly, and not as close to the line as can possibly be tolerated."

To the same effect are *State v. Phillips*, 118 Iowa 660; *State v. McCausland*, 137 Iowa 354; and *State v. Smith*, 194 Iowa 639. The frequent warnings thus given against the use of this phrase in such an instruction should be construed to mean that a case can arise where this court would reverse for the use of this phrase in such instruction. We have read the instructions, however, in the instant case, and feel that in this case we would not be warranted in reversing on this ground.

The first instruction asked by appellant was one attempting to define "premeditation," and the second, a definition of "deliberation." We have read these requested instructions with care, and feel that the matter contained in each instruction is not a fair, clear, and concise definition of the words attempted to be defined. Therefore, the court was warranted in refusing to give such instructions.

As a part of the twelfth instruction, the court said to the jury:

"Where the life of a human being is taken with a sedate and deliberate mind, and in pursuance of a previously formed design to kill, the malice is 'express.' Under such circumstances, the presumption of malice is conclusive."

The objection to the instruction lies in the last clause, where the jury is told that "the presumption is conclusive." In *State v. Wilson*, 157 Iowa 698, an instruction in almost identical words with the one considered here is condemned. We said, in that case, that, if there was a plea of self-defense, it would be reversible error to give such an instruction. We even held, in the *Wilson* case, that we did not approve the instruction given. In the instant case, the plea of the defendant was that of self-defense, and that alone. In the *Wilson* case, we said:

4. HOMICIDE: malice: non-conclusive presumption: instructions.

"In this case, had there been anything in the evidence or in the circumstances * * * showing justification or excuse, the court should have qualified the instruction."

So we say as to the instruction in this case. This instruction should have been qualified by saying that, in the absence of any evidence showing justification or excuse, the presumption is conclusive. We do not deem it wise to say, in an instruction of this kind, that such a presumption is conclusive, or not rebuttable, unless the instruction is qualified as herein expressed, in cases of the character of the one before us.

Instruction 18, given by the court, reads, in part, as follows:

"If you believe from the evidence, beyond a reasonable doubt, that a purpose or design to kill was distinctly formed in the mind of the defendant, and at any moment before, or even at the time, an assault was made by him upon said Daniel Detling, if such assault was made, but only long enough prior to the making of such assault to admit of deliberation and premeditation, and if you believe such assault was made, and was willful, deliberate, and premeditated, this would be murder in the first degree."

5. HOMICIDE: murder: essential elements: instructions.

Complaint is lodged against the instruction for the use of the phrase "or even at the time the assault was made." Premeditation, deliberation, malice aforethought, and intent to kill must all exist in the mind of the defendant before the fatal blow is struck. The length of time that they exist, of course, is immaterial. It is also true that they must carry over, and be present in the mind of the defendant at the time the blow is struck; but we are fearful that, under this instruction, the jury might draw the conclusion that, even though these elements did not exist before the fatal blow was struck, they were in fact

present at the very time of the striking of the fatal blow, and that this would be sufficient. Such is not the law. In *Fouts v. State,* 4 G. Greene 500, at page 508, we said:

"It is not consistent to say that a *previous* design to do a thing may be formed at the very time the thing is done."

While we might not be disposed to reverse in this case, this phrase would best be eliminated, on a resubmission, to avoid any question of doubt.

In the twenty-seventh instruction, the court gathers together certain elements of the crime, and tells the jury that, if these elements are proven, they should find the defendant guilty of murder in the first degree, and return a verdict accordingly. Where the court attempts to give an instruction of this kind, it is its duty to set out all the elements constituting the crime charged; and a failure so to do is reversible error. Other instructions which may properly cover the case will not be of aid to such an instruction. The instruction given wholly ignores the element of malice aforethought and intent to kill. In *State v. Glaze,* 177 Iowa 457, under a similar situation, we said, referring to objection to a similar instruction:

6. CRIMINAL LAW: trial: instructions: inadequate enumerations of elements.

"The objection cannot be concluded by invoking the rule that the instructions must be taken together. * * * The jury had been instructed as to what it must find to justify a conviction. It was then told 'that, if it could not find those things, it might still convict if some other things were found. This last enumeration omitted one essential. Its giving was error. For all we can know, the verdict may rest on a finding that defendant was short, and, on demand, refused or neglected to pay. It may, to be sure, rest on the elements outlined by other instructions, but who is to say it does? We must reverse where, for all we know, the jury may have adopted the erroneous instead of the correct rule."

It is urged that the evidence in behalf of the State in this case was insufficient to take the case to the jury on the charge of murder in the first degree. We have read this evidence with care, and find otherwise.

Some other errors are called to our attention, but we do not deem them of sufficient importance to extend this opinion.

Appellant filed a motion for change of venue, which was

overruled; and this is assigned as error. We must say that the showing here made for a change of venue is very strong, and

7. CRIMINAL LAW: under some of our earlier holdings, would have
change of venue: warranted the court in granting such change;
discretion of
court. but we have held that this ordinarily is a question of discretion with the district court, and that, unless such discretion is abused, the ruling will not be disturbed by us. In view of the fact that this case is reversed on other grounds, and is to be retried, it is probable that, by the time it is reached and retried in the district court, a large part of the grounds upon which the motion was predicated will have passed away. Experience shows that the excitement and prejudice incident to a tragedy of this kind are very high in the community at the time of and shortly after the occurrence, but they soon subside, and time, the great leveler of all things, tends to allay the excitement and largely efface the prejudice. In view of these matters, we do not feel that we would be warranted in reversing the district court for a failure to sustain this motion for a change of venue.

A motion was also made for a continuance, based on the same grounds as the motion for change of venue. In the light of the fact that the case is reversed and remanded for a new trial, the question of whether or not a continuance should have been granted at the time that motion was filed, has now become moot.

For the errors herein pointed out, the case is reversed, and remanded for new trial.—*Reversed and remanded.*

DE GRAFF, C. J., and EVANS, STEVENS, FAVILLE, VERMILION, and MORLING, JJ., concur.