PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* PERFECTO QUILES, Defendant and Appellant.

No. 4083.  Argued May 7, 1930.—Decided March 11, 1931.

*R. Cuevas Zequeira* and *F. Rodríguez Alverio* for appellant. R. A. *Gómez* for appellee.

Mr. Justice Wolf delivered the opinion of the Court.

This was a case where the *Fiscal* of this court suggested a reversal on the ground, perhaps among others, that the court to which the case was submitted without a jury incurred in manifest error in not believing (*rechazando*) the evidence tending to show self-defense brought by the defendant and in giving credit to the sole testimony of the injured man. The crime charged is an assault with intent to commit murder, and counsel who argued the case orally in this court was not counsel in the court below. The *Fiscal* of this court resumes the evidence for the Government more or less in this fashion: That Antonio Flores, the man who was shot by Quiles (the defendant) was in the shop of Eusebio Miranda in company with Juan Maldonado, Francisco Ruiz, Federico Luna and Etanislao Rodríguez, and also the owner, Eusebio Miranda; that Víctor Cabrera, majordomo of Quiles, arrived at the shop of Miranda to ask Flores to come to the house of Quiles to take a letter for him; that Cabrera and Flores left the shop of Miranda, while the others stayed there; that the house of Quiles was at a distance of a little over one-hundred feet away (*media cuerda*); that the persons who stayed in the shop heard two or three shots and went to the house of Quiles and found Flores wounded on the ground with wounds in the thighs. Other matters were recited by the *Fiscal* unnecessary to relate, and then he said that the testimony tended to show that Flores was half-seas over (*picado*), that is to say, that he was intoxicated (*metido en licor*); that by

the statement of the doctor, Flores received two wounds in the thighs of a light character which healed rapidly. By the testimony of Chief of Police Soldevila it was shown that when Perfecto Quiles delivered himself he said that he came to do so because he had fired some shots at a certain Flores, and that when the Chief asked Quiles if he had killed Flores the defendant said that he did not know; that Quiles did not know where the pistol was with which he had shot; that the complaining witness, Flores, gave testimony to the effect that on the afternoon of Good Friday, the 29th of March, 1929, he was in the shop of Eusebio Miranda with the persons before mentioned; that Víctor Cabrera came to look for him to have him go to the house of Quiles; that he went out with Cabrera to the house of the defendant, and that upon his arrival there the defendant Perfecto Quiles, who had a pistol, without any exchange of words or any quarrel between them and without saying anything came upon him (Flores) firing three shots, wounding him with a shot in the thigh of each leg, and that he fell to the ground, and from there Francisco Ruiz and other friends picked him up and carried him to the shop of Miranda and then to the hospital. This is more or less the synthesis of the evidence of the Government made by the *Fiscal.* We should add, however, the following undisputed facts: that the doctor testified, not alone that the wounds were received in the thighs, but in the upper part thereof; that Quiles, without any investigation of the condition of the fallen man, rode away. Furthermore, it was an established fact, considering the disinterested nature of the testimony of the witnesses, that Flores went to the shop or house of Quiles at the invitation of the latter. The evidence of the defense, consisting in the testimony of Víctor Cabrera, Ramón Nazario, and the defendant Perfecto Quiles, summed up by the *Fiscal,* tended to show that on the afternoon of the day mentioned the defendant Quiles was going around his property attending to his work, and that he was carrying a pistol; that

upon returning to his house more or less at three o'clock in the afternoon he found that his employee Pablo Cabrera, the son of Víctor Cabrera, was not in the house, and that, wanting him for a job (*trabajo*) he sent Víctor Cabrera to look for him in the shop of Eusebio Miranda; that Víctor Cabrera, to comply with this errand (*encargo*), went to the shop of Miranda and gave the message to Pablo Cabrera; that upon going out to the house of Quiles, Antonio Flores said to him: "Don Víctor, I'll go along with you," and that the three of them went to the house of Quiles; that before arriving at the house of Quiles, Flores said to Víctor Cabrera, "I come here with you to show that I am all man, and a brave one, too"; that upon arriving and getting together with Quiles, Flores uttered words which we need not to transcribe, but no more insulting words can be used in Spanish; that Quiles answered them telling him to hold back and not to come any closer; that Flores then reached for a black-handled razor that he had in his rear pocket and came forward although Quiles said that he should stay back and not come closer, but that nevertheless he came up and made a fresh assault; that Quiles stepped back and stumbled upon the-wall of the shop, and as he could not go any further back, then he fired; that Flores was drunk; that on the morning of the same day Flores had been to the house of Quiles, some of the witnesses being present, and also some young ladies and the wife of Quiles, all of them playing lotto; and that Flores came up, went through the living room (*sala*) and said that he would cut up the lotto and destroy it; that when this happened in the morning Perfecto Quiles was not in his house; that Flores in the same morning used similar insulting language as in the afternoon, and that he is a depraved fellow, who had loved to fight since he was a boy; that also Mr. Modesto Cobián testified to the reputation of the defendant, saying that he considered the defendant honest, religious, industrious and faithful to his duties.

To this summing up it should be added that from the whole evidence there can be no doubt that Flores was a fighting and even a provocative man; that the defendant admitted that no razor was found; that he testified that he only shot when Flores was at a distance of a desk away; that, more particularly, and this is very important that, Quiles, Víctor Cabrera and Ramón Nazario all denied the established fact that Flores came to the house of Quiles upon the invitation of the latter. Likewise, Quiles positively denied that he had any knowledge of the incident that occurred in his house on the morning of the same day, although both Cabrera and Nazario knew it. From this recital taken from our reading of the dry record, it is evident that the judge of the district court, by whom the case was tried without a jury, did not believe the testimony of the witnesses of the defendant, and we can not find that he was mistaken. Moreover, when it is conceded that the court had a chance to observe all the witnesses, which we have not, we do not feel ourselves in a situation to question that the court had a right to disbelieve the said witnesses. The appellant and the *Fiscal* rely somewhat on the fact that none of the witnesses of the Government except Flores himself was present at the time of the shooting, while all of the defendant's witnesses were. Although Flores denied that he had been in the house of Quiles in the morning, nevertheless, the court had a right to believe the rest of his testimony, and this, although he had a bad reputation for fighting and drunkenness. The denial by the defendant's witnesses of the invitation to Flores is a salient fact in the case which almost by itself would have justified the court in disbelieving the statement of the defendant and his witnesses; similarly the denial by Quiles of having had any knowledge of what took place in the morning. We may infer from the questions of the court that the latter believed that the motive of the shooting was the conduct of Flores in the morning of the same day.

The *Fiscal* also did not set forth the fact that Quiles said that he shot at the feet of Flores, although as developed in the evidence the shots took effect in the upper part of each thigh of Flores, hence very close to vital spots of the body. The court evidently did not believe that Quiles shot at the feet of Flores. Under the circumstances as recited, the court had a right to believe from the testimony of Flores and the other direct and circumstantial evidence that Quiles shot directly at Flores, or else shot so recklessly that he might readily have caused his death; likewise that Quiles shot not in self-defense but because he was annoyed by the conduct of Flores. The proof of self-defense aside, the court apparently found that Quiles, thoroughly enraged by the conduct of Flores in the morning, sent for him and shot at him with intent to kill. This was probably the idea of the judge, but he might have had a slightly different theory and we still should not feel ourselves in a condition to reverse on the ground that the judgment was contrary to the evidence, as assigned.

The appellant cites from *People* v. *Grenshaw*, 298 Ill. 412, 15 A.L.R. 671, but so much of the opinion as is transcribed in the brief shows that the deliberate intention to kill may be shown by the facts established by the proof. There could be no doubt in this case that if the intention to kill existed, it was deliberate. A similar inference may be drawn from *State* v. *Sips*, 202 Iowa 173, 47 A.L.R. 407, also cited by appellant. In *People* v. *Grandi*, 33 Cal. App. 637, the defendant admitted on the witness stand that he fired two shots from a gun at the time of the alleged assault, but positively declared that he did not shoot at Tognola. The court said, after disposing of the errors assigned: "We have now considered all the points urged for a reversal, and, having fully examined and considered the whole record, have found no legal reason for setting at naught the result arrived at below." While the case possibly may be distinguished, it tends to show that

where the direct and circumstantial evidence are such as existed in the present case, an appellate court will not disturb the finding of the trier of the facts.

If one man shoots at another and kills him, the deliberate intention may be inferred from the death. Section 247 of the Code of Criminal Procedure. However, all the authorities show that where the crime charged is assault with intent to kill no intention can be inferred, not even from the use of a deadly weapon, but the Government is bound to prove the deliberate intention. *People* v. *Mize,* 80 Cal. 41, also cited by the appellant to a large extent shows this statement of the law. As we have indicated the government presented such a case that the court below had a right to find beyond a reasonable doubt the guilt of the defendant. This disposes of the third and fourth assignments of error.

The first assignment of error, to the effect that the defendant did not have a speedy trial, merits little consideration. It appears that no question of this kind was raised in the court below, and we have nothing before us from which we could reverse on this ground.

We do not agree with the appellant, as assigned in his second error, that the court exceeded its authority in suggesting to the district attorney, as was the fact, that he had failed to call the doctor in the case. The court has a wide discretion in preventing a miscarriage of justice, and we find no abuse.

The defendant also filed a motion for a new trial. The court committed no error in maintaining that the evidence presented by the affidavits was not sufficient to change its weighing of the evidence. The court had a full right, when the evidence was either cumulative or the court was convinced of the falsity thereof, to refuse to award a new trial.

Furthermore, the court held that not only was the evidence unavailing to change the conviction of guilt but that the defendant had not, as a matter of law, satisfied the court

that the matters to which the affidavits related could not have been discovered by due diligence on the part of the defendant before the trial. Take for example the matter of the alleged discovery of the razor. The defendant was bound at the time of the trial to know that he would be questioned on the existence of the razor, and if in fact the razor was found it could have been found before. Too easily and without any direct connivance of the defendant but by the intervention of any of his friends such a razor might have been unearthed.

The judgment appealed from will be affirmed.